GTE MTO, INC., successor to General Telephone Company of Illinois, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents (AT&T Communications of Illinois, Inc., Intervenor).—ILLINOIS INDEPENDENT TELEPHONE ASSOCIATION, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents (AT&T Communications of Illinois, Inc., Intervenor).

Fourth District   Nos. 4—87—0430, 4—87—0437, 4—87—0438 cons.

Opinion filed February 3, 1988.—Modified on denial of rehearing
April 6, 1988.

Vernon C. Maulson and James C. Stroo, both of GTE MTO, Inc., of Bloomington, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Kathleen Nolan and

Douglas W. Trabaris, Special Assistant Attorneys General, of Chicago, of counsel), for respondent Illinois Commerce Commission.

Thomas R. Phillips and Susan D. Proctor, both of Chicago, for respondent AT&T Communications of Illinois, Inc.

JUSTICE McCULLOUGH delivered the opinion of the court:

On December 17, 1986, AT&T Communications of Illinois, Inc. (AT&T), filed application with the Illinois Commerce Commission (ICC) under the Universal Telephone Service Protection Law of 1985 (Protection Law) (Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—100 *et seq.*). The application (86—0541) sought revisions to AT&T's competitive services tariff, specifically designating three new services (SDN, MEGACOM, MEGACOM 800) as competitive. On December 18, 1986, AT&T filed a second application (86—0542) seeking to amend its certificate of interexchange service authority to enable AT&T to provide intramarket service area (intra-MSA) interexchange telecommunications service, specifically the three proposed services (SDN, MEGACOM, MEGACOM 800). The two cases were consolidated for hearing before the ICC.

Petitions to intervene as "potentially affected providers or customers" were filed by: Illinois Consolidated Telephone Company (ICTC); Illinois Bell Telephone Company (Illinois Bell); General Telephone Company of Illinois (GTE); and Illinois Independent Telephone Association (IITA). MCI Telecommunications Corporation (MCI) filed a brief with the ICC in support of AT&T's application. Following hearing on the matter, the ICC entered orders, dated April 15, 1987, approving AT&T's proposed revisions. IITA appeals both orders. GTE appeals the order allowing AT&T to provide the new services (86—0541).

Petitioners allege four issues for our consideration upon review. In light of our ruling, however, it is only necessary for us to reach the first issue presented, that being: whether the ICC's order, granting AT&T the authority to provide intra-MSA interexchange telecommunications services (86—0542), is in violation of section 13—403 of the Protection Law. During hearing before the ICC there was little dispute that the proposed services should be classified as competitive. We affirm the ICC order designating the proposed services as competitive as it applies to inter-MSA services (86—0541).

We find the order of the ICC in 86—0542 in violation of section 13—403 and consequently reverse.

The State of Illinois is divided into 19 market service areas for

telecommunications. A market service area (MSA) is a geographical area consisting of one or more exchanges, defined by the ICC for administration of tariffs, services, and other regulatory obligations. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—208.) Intra-MSA service is service between two points located in the same MSA. Interexchange service is service between points located in two or more exchanges. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—205.) AT&T is properly certified to provide interexchange service in Illinois.

There are two major groups of telecommunications carriers in Illinois. The first group consists of local exchange carriers (LEC) which provide facilities-based service within local exchanges and between points in different local exchanges that are within the boundaries of a specific MSA (intra-MSA service).

The second group of telecommunications carriers is composed of interexchange carriers. These carriers primarily provide facilities-based service between points in different MSA's (inter-MSA service) or between points in different States.

AT&T is an interexchange carrier in Illinois. AT&T was issued a certificate of public convenience and necessity on December 18, 1984, authorizing AT&T to provide inter-MSA interexchange services within Illinois. AT&T provides private line service, message toll service (MTS), wide-area telecommunications service (WATS), and 800 service on an inter-MSA and interstate basis. AT&T is not a local exchange carrier.

As of January 1, 1987, interexchange carriers were allowed to provide intra-MSA interexchange service (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—403). In order to provide such service, however, an interexchange carrier must obtain authority from the ICC. Under the new Protection Law, the ICC may issue multiple certificates to provide intra-MSA interexchange service if the applicant "possesses sufficient technical, financial and managerial resources and abilities" to provide the service. Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—403.

It is under this specific provision that AT&T sought to amend its certificate. In its application, AT&T sought approval to offer three new custom network services (SDN, MEGACOM, and MEGACOM 800) on an intrastate basis. AT&T has offered these services on an interstate basis since November 1985. The services are primarily intended to meet the interstate telecommunications requirements of large business customers. Consequently, AT&T intends to offer the services intrastate only as an "add on" to interstate service.

The three services proposed are offered only between AT&T's own service offices. Therefore, customers must provide the access fa-

cilities necessary to connect their locations to AT&T's serving offices. This type of access, termed dedicated access, connects the customer's location only with AT&T's network. Customers may arrange to purchase access through AT&T, directly from local exchange companies, or they may choose to provide the access themselves.

In contrast to dedicated access, customers subscribing to standard long-distance offerings use switched access. Under this process, a long-distance customer may select the interexchange carrier he wishes to use on a call-by-call basis. A customer may designate a carrier, through what is termed "presubscription" process, to complete his calls. Then, when he dials "1," plus the area code and telephone number, the call is automatically routed to the presubscribed carrier. The customer may also select other interexchange carriers by dialing "10" plus a five-digit carrier-specific access code before the area code and telephone number.

A carrier-specific access code is a five-digit number assigned to a specific carrier which identifies that carrier uniquely from all others. On inter-MSA calls, the carrier-specific access code must be dialed before the called party's telephone number so that the call is initially routed to a particular interexchange carrier.

To date, the only service which utilizes this presubscription process has been inter-MSA long-distance service. Services utilizing dedicated access facilities have not been involved. All intra-MSA long-distance calls continue to be routed to the local exchange companies. Thus, carrier-specific access codes currently are used only for intra-MSA long-distance calls.

At the ICC hearing, AT&T presented Cynthia Stach, staff manager for marketing plans implementation, who described the three proposed services. Stach further testified that SDN, MEGACOM, and MEGACOM 800 services are competitive in Illinois and classification as such is consistent with the Protection Law.

Michael Pfau, district manager of marketing plans implementation for AT&T, described the capabilities and operation of the three proposed custom network services. He testified that the proposed services are in compliance with applicable provisions of the Protection Law and will further the legislative intent embodied therein for increased innovation and efficiency in telecommunications services.

Pfau stated that the Protection Law's requirement of carrier-specific access codes under section 13–403 is limited in application to the LEC's. Since it is technologically impossible for AT&T to implement use of carrier-specific access codes for the proposed services, it would be contrary to the legislative declaration of the Protection

Law to impose such a requirement. The purpose of the Protection Law is to provide telecommunications widely and economically on a competitive basis. The access code requirement, if imposed, would effectively prevent the development of competition intra-MSA.

Madelon Kuchera, program director of the telecommunications program, policy analysis and research division of the ICC staff, testified in support of AT&T's application. Kuchera noted that the new Protection Law provides for gradual competitive entry into all telecommunications markets, including intra-MSA service offerings. With respect to the requirement of carrier-specific access codes, Kuchera noted that the pertinent section applied to intra-MSA service offerings which utilize local exchange service access lines and not to any service using dedicated access.

Illinois Bell presented Fred Konrad, vice-president, who explained the dialing arrangements in existence on July 1, 1985. He testified that under the new Protection Law, AT&T could only provide intra-MSA services if a carrier-specific access code were employed. He claimed the services proposed by AT&T would not comply with this limitation. Consequently, Konrad maintained that AT&T would be completing intra-exchange calls without possession of the necessary certificate from the ICC. Illinois Bell's evidence further included statistics that it would have $38 million in annual revenue at risk should AT&T's application be granted.

GTE presented Theodore Kunkle, who testified that granting AT&T's application would lead to a deaveraging of toll rates, intra-MSA toll rate increases, and local rate increases, thereby jeopardizing universal service and making the existing primary toll carrier plan unworkable. He claimed that the services would allow customers to complete local exchange calls without the use of the LEC's. He also presented evidence that GTE would have a substantial revenue loss if AT&T were allowed to provide the proposed services.

Dwight Zimmerman testified on behalf of IITA concerning public interests and policy considerations relating to the granting of AT&T's intra-MSA interexchange certificate. Zimmerman claimed it was not in the best interest of the public to provide these services.

None of the intervenors challenged the technical, financial, and/or managerial resources and abilities of AT&T to provide the proposed services. Likewise, there was no controversy regarding classification of the services as competitive.

On April 15, 1987, the ICC entered its order approving AT&T's applications. The ICC found the proposed services were not in violation of the Protection Law. (Ill. Rev. Stat. 1985, ch. 111⅔, pars.

13—401, 13—403.) The ICC further found that these services were competitive, would benefit the public, and should be authorized.

In addition to the order of the Commission (86—0541), concurring opinions were filed by Commissioners Stone and Foran. A dissenting opinion was issued by Commissioner Kretschmer.

Commissioner Stone, while finding that AT&T's services did not violate section 13—403, nonetheless found that the carrier-specific access code provision in section 13—403 can apply to services other than MTS services. The characteristics of such services, however, were technically undefined at the time. Consequently, Stone suggested that application of section 13—403 be made on a case-by-case basis. Commissioner Stone concluded that SDN, MEGACOM, and MEGACOM 800 services would not violate section 13—403 simply because the services are not intended for and will not be marketed for intraexchange communications.

Commissioner Foran, while concurring, disagreed with the order's finding that the Protection Law has as its fundamental premise the concept that competition will bring innovative services and reduced prices to Illinois customers. He asserted the Protection Law does not provide for the gradual entry of competition into *all* Illinois telecommunications markets. He thus rejected any implication that competition *per se* is either a goal or fundamental premise of the Protection Law. Rather, Foran noted the goal of the law is that telecommunications services should be available to all Illinois citizens at just, reasonable, and affordable rates. He, however, found insufficient evidence in support of the alleged revenue losses or rate increases of the LEC's or that the other services would be adversely affected by allowing AT&T's application.

Commissioner Kretschmer dissented on two grounds. Initially, she found the approval of AT&T's services, absent further study of any adverse ramifications, inconsistent with the prerequisite protection of consumers as enunciated in the Protection Law. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—103(b).) Second, Kretschmer argued that under section 13—403, AT&T could not be permitted to use "1 plus" dialing in providing the three proposed services without the ICC first reporting to the Illinois General Assembly on October 1, 1988, and considering the direction provided by the General Assembly. From this order, petitioners appeal.

On January 1, 1986, the Universal Telephone Service Protection Law of 1985 (Protection Law) came into effect. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—100 *et seq.*) The Protection Law was adopted in response to the findings of the General Assembly that:

"(a) [U]niversally available and widely affordable telecommunications services are essential to the health, welfare and prosperity of all Illinois citizens;

(b) recent federal regulatory and judicial rulings have caused a restructuring of the telecommunications industry and have opened some aspects of the industry to competitive entry, thereby necessitating revision of State telecommunications regulatory policies and practices;

(c) the competitive offering of telecommunications services may create the potential for increased innovation and efficiency in the provision of telecommunications services and reduced prices for consumers; and

(d) protection of the public interest requires continued regulation of telecommunications carriers and services for the foreseeable future." Ill. Rev. Stat. 1987, ch. 111⅔, par. 13—102.

In response to these findings, the legislature declared that telecommunications services be made available "at just, reasonable and affordable rates," these services being economically provided "in sufficient variety, quality, quantity and reliability to satisfy the public interest." (Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—103(a).) In order to protect the interests of consumers and further public interests in general, the legislature deemed that competition within the field of telecommunications be permitted to substitute for certain aspects of regulation. Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—103(b).

Debates before the General Assembly prior to adoption of the Protection Law indicate that the provisions presented were a combined effort among the telecommunications industry, the ICC, and the legislators. (84th Ill. Gen. Assem., House Proceedings, May 24, 1985, at 271 (statements of Representative Hastert).) Representative Hastert indicated House Bill 1814 was a culmination of two years of study by the joint committee, extensive hearings, and deliberations. Hastert further stated that while the bill attempted to maintain universal telecommunications service levels in Illinois, it also sought to phase in competition in the market. It was hoped that this competition would ultimately result in the legislative goal of universally available and widely affordable telecommunications services. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—102.) The nature of such change, however, required the legislature to establish a reasonable time frame so as to allow for an orderly transition in the provision of services. Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—103(c).

■ To date, there is no case law in Illinois construing the new

Protection Law. Where statutory language is plain and unambiguous, it is the duty of the courts to give words their ordinary meaning. (*Potts v. Department of Registration & Education* (1986), 145 Ill. App. 3d 960, 496 N.E.2d 253.) Each word, clause, or sentence should be given some reasonable meaning if possible. *Potts*, 145 Ill. App. 3d 960, 496 N.E.2d 253.

When the statutory language, standing alone, is insufficient, courts are to ascertain and give effect to the intent of the legislature. (*Stewart v. Industrial Comm'n* (1987), 115 Ill. 2d 337, 504 N.E.2d 84.) In determining the legislature's intent, the court may properly consider the language used in the statute, the reason and necessity for the law, the evil sought to be remedied, and the purpose to be achieved. *Stewart*, 115 Ill. 2d 337, 504 N.E.2d 84.

In *Potts*, we discussed statutory construction by administrative agencies, specifically noting:

"Courts will also give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute. [Citations.] Agency interpretation of statutes which they enforce is a persuasive indication of legislative intent. [Citation.] However, the courts are not bound by administrative statutory interpretations." *Potts*, 145 Ill. App. 3d at 962-63, 496 N.E.2d at 254.

●2 Standards for appellate review of an ICC order are further enunciated in the Public Utilities Act. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201.) The burden of proof on appeal is upon the appealing party. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(d).) The ICC order is presumed *prima facie* reasonable and findings of fact made by the commission are held *prima facie* correct. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(d).) Upon review, the court shall reverse an order where findings "are not supported by substantial evidence based on the entire record." Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(e)(iv)(A).

Paragraph 13—403 of the Protection Law provides, in pertinent part:

"The Commission shall not permit any telecommunications carrier providing interexchange telecommunications service to use intra-Market Service Area dialing arrangements in place July 1, 1985 which do not require the use of telecommunications carrier-specific access codes unless such carrier is also properly certified to offer or provide facilities-based local exchange telecommunications service, prior to a legislative deter-

mination to the contrary. The Commission shall conduct a study, and, after notice and hearing, issue a report with findings and recommendations concerning the advisability of permitting a change in the use of such dialing arrangements. Such report shall be submitted to the General Assembly on October 1, 1988." Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—403.

Dialing arrangements in existence on July 1, 1985, were such that intra-MSA calls were routed by dialing the called party's seven-digit telephone number, plus the applicable area code when necessary. Parties were required to presubscribe to a particular carrier. The calls were then directly routed to that particular carrier without the use of a specific access code. This routing method is termed the "1 plus" dialing advantage. AT&T is not properly certified to provide facilities-based local exchange telecommunications services. The services proposed to be offered by AT&T do not require the use of carrier-specific access codes. There has not been any legislative determination that the section 13—403 limitation should not exist with respect to AT&T. Thus, according to statutory mandate, AT&T cannot provide its proposed services without carrier-specific access codes.

In its order, the ICC found section 13—403 inapplicable to AT&T. Noting that the proposed services meet the objectives of the Protection Law by introducing innovative alternatives at reduced prices, the ICC stated:

"[T]he dialing arrangements requested by Illinois Bell would appear technically burdensome and uneconomical, if not impossible, to implement and would tend to allow the local exchange carriers to enjoy a monopoly market while preventing development of competitive intra-MSA services, a result contrary to Section 13—103."

The ICC noted the presence of ambiguity in the language of section 13—403, but nonetheless approved AT&T's application. The ICC accepted AT&T's argument that section 13—403 was intended by the Illinois legislature to apply only to MTS services and not services such as SDN, MEGACOM, and MEGACOM 800.

■■ ■ Section 13—403 unequivocally states that the ICC "shall not" permit interexchange intramarket telecommunications services without carrier-specific access codes. (Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—403.) Generally, the use of the word "shall" in a statute indicates mandatory obligation, unless the context indicates otherwise. (*Newkirk v. Bigard* (1985), 109 Ill. 2d 28, 485 N.E.2d 321.) The meaning of "shall," however, is not exclusive or fixed and may prop-

erly be construed in the directory sense, depending upon the intent of the legislature. (*Marshall v. Ellison* (1985), 132 Ill. App. 3d 732, 738, 477 N.E.2d 830, 835.) The "shall" will not be given a permissive meaning where it is used with reference to any right or benefit, and such right or benefit depends on giving a mandatory meaning to the word. (*Newkirk*, 109 Ill. 2d 28, 485 N.E.2d 321.) Thus, in the context of the legislative goals and purposes of the Protection Law, the directive "shall" as utilized in section 13–403 is mandatory.

It is of additional importance to note the last sentence of the applicable section, which states that the ICC shall conduct a study and make "recommendations concerning the advisability of permitting a change in the use of such dialing arrangements." (Ill. Rev. Stat. 1985, ch. 111⅔, par. 13–403.) This gives further support to the mandatory nature of the requirement of carrier-specific access codes. Only after legislative consideration are the dialing arrangements to be amended.

The legislative history of the Protection Law indicates the policy behind it was "to maintain available and affordable telephone service for all the people in the State of Illinois." (84th Ill. Gen. Assem., House Proceedings, May 24, 1985, at 271 (statements of Representative Hastert).) Noting recent technological changes, as well as the forced divestiture of AT&T, the legislature indicated that competition in the telecommunications industry had come of age. It was, however, the express intent of the legislators to see that the competition was fair and equitable to all competitors. 84th Ill. Gen. Assem., House Proceedings, May 24, 1985, at 272 (statements of Representative Huff).

The legislators further stressed the importance of a gradual phase-in of competition in the market. (84th Ill. Gen. Assem., House Proceedings, May 24, 1985, at 271 (statements of Representative Hastert).) To ensure a smooth transition, the bill contained a mandate to the ICC to closely monitor changes in the industry and to report at least annually on the need to add necessary protections. 84th Ill. Gen. Assem., House Proceedings, May 24, 1985, at 272 (statements of Representative Hastert).

■ Pursuant to the mandates of the Protection Law, the ICC issued an annual report on telecommunications in 1986. The report outlined the current developments in the telecommunications industry. The report did not specifically request any changes with respect to the current dialing arrangements per section 13–403. Contrary to the findings of the ICC, section 13–403 makes no exception for the access code requirement. It is not within the power of the ICC to al-

low for such exceptions, especially in light of the statutory mandate for legislative review prior to any change in dialing requirements. As such, the order of the ICC (86—0542) is in violation of section 13—403 of the Protection Law.

The order subject to appeal in cause No. 4—87—0438 is reversed.

The order appealed in cause Nos. 4—87—0430 and 4—87—0437 to the extent that it applies to inter-MSA services is affirmed.

The order appealed in cause Nos. 4—87—0430 and 4—87—0437 is reversed to the extent that it applies to intra-MSA services.

GREEN, P.J., and SPITZ, J., concur.