ILLINOIS INDEPENDENT TELEPHONE ASSOCIATION, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.—GTE NORTH INCORPORATED, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.

Fourth District   Nos. 4—87—0899, 4—87—0919 cons.

Opinion filed November 3, 1988.—Modified on denial of rehearing June 15, 1989.

222

Dennis K. Muncy and Peggy C. Thompson, both of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, P.C., of Champaign, for petitioner Illinois Independent Telephone Association.

Vernon C. Maulson and James C. Stroo, both of GTE North Incorporated, of Bloomington, for petitioner GTE North Incorporated.

Neil F. Hartigan, Attorney General, of Springfield (John P. Kelliher, Special Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Commerce Commission.

Marcia C. Alterman, of Chicago, for respondent MCI Telecommunications Corporation.

Robert F. Ward, of Chadwell & Kayser, Ltd., of Chicago, and Michael L. Ball, Donald A. Low, and Eva Powers, all of US Sprint Communications Company, of Kansas City, Missouri, for *amicus curiae.*

JUSTICE KNECHT delivered the opinion of the court:

This case involves questions concerning the conditions under which long-distance telephone carriers may provide service between points located in the same market service area (MSA). Several provisions of the Universal Telephone Service Protection Law of 1985 (Protection Law) (Ill. Rev. Stat. 1985, ch. 111⅔, pars. 13—100 through 13—803) provide the principal bases for the contentions of the parties.

Many technical terms peculiar to the telecommunications industry pervade this opinion. These terms are defined in our recent opinion in *GTE MTO, Inc. v. Illinois Commerce Comm'n* (1988), 166 Ill. App. 3d 916, 521 N.E.2d 547, and we will not in this opinion repeat their definitions. (On January 6, 1989, the supreme court dismissed a petition for leave to appeal this court's decision in *GTE MTO* and vacated this court's judgment in that case. In a further order entered February 24, 1989, the supreme court denied a motion to reconsider its January 6, 1989, dismissal of the petition for leave to appeal in *GTE MTO* and

remanded the cause to this court with instructions to consider all issues briefed and argued by the parties. The apparent basis for these orders was amendments to the Universal Telephone Service Protection Law of 1985 (Ill. Rev. Stat. 1985, ch. 111⅔, pars. 13—100 through 13—803), which were passed by the legislature and signed into law after the filing of this court's opinion in *GTE MTO*. (Pub. Act 85—1161, eff. Aug. 12, 1988; 1988 Ill. Legis. Serv. 1188, 1188-89 (West); 1988 Ill. Laws 1306 (amending Ill. Rev. Stat. 1987, ch. 111⅔, par. 13—405).) These statutory amendments are discussed later in this opinion. They do not, however, affect the validity of the definitions of technical terms contained in this court's opinion in *GTE MTO*.)

On December 22, 1986, respondent MCI Telecommunications Corporation (MCI) filed with the Illinois Commerce Commission (ICC) an application for modification of its intra-MSA certificate of interexchange service authority, requesting it be authorized to provide facility-based intra-MSA interexchange telecommunications services throughout Illinois. MCI's application noted the ICC had previously found MCI possesses sufficient technical and operational competence, and possesses the legal authority and financial ability, to be entitled to authority to provide inter-MSA service in Illinois. MCI further noted that on May 16, 1986, the ICC had granted it authority to provide resold intra-MSA interexchange telecommunications services throughout Illinois.

In orders not included in the record, the Illinois Independent Telephone Association (IITA) and GTE North, Inc. (GTE), were apparently granted leave to intervene in this proceeding.

An evidentiary hearing on MCI's application for modification of its certificate of interexchange service authority was held on May 26, 1987. Robert M. Barry, a senior analyst for MCI, presented prepared testimony. Barry stated MCI possesses the technical and managerial ability to provide intra-MSA service. He stated, "the evidence used to support MCI's qualifications to provide inter-MSA service is identical to that needed to support an application to provide intra-MSA service." Barry also testified MCI's ability to provide intra-MSA service is further demonstrated by its continued provision of inter-MSA service.

Barry also stated MCI is financially qualified to provide intra-MSA service. It is the second largest interexchange telephone company in the nation, with substantial assets and a demonstrated ability to secure funds in the capital market. Barry further stated MCI's customers will use carrier-specific access codes when using MCI's dial one/direct dial service on an intra-MSA basis.

On cross-examination, Barry stated the services which MCI seeks to provide on an intra-MSA basis are the same as those it currently

provides on an inter-MSA basis—dial one/direct dial service, credit card service, dedicated leased line service, and WATS service. There are presently no plans to provide services other than these.

Barry stated according to MCI's tariff, WATS customers must originate calls via dedicated facilities between their premises and MCI's terminal location, and such calls are terminated via a combination of MCI-provided intercity facilities, local business telephone lines, and the resold facilities of other carriers. According to Barry, MCI is not certified to provide any facility-based local exchange service in Illinois. It might technically be possible for users of MCI's WATS, credit card, and dial one/direct dial services to use the services to make calls within a local exchange, but such use of these services is not cost effective. This is not "the service that MCI involves in the market place" and is not a service that MCI promotes. Sophisticated WATS users would have "very little incentive to give of a cost associated with tying up of a WATS line to make local exchange calls."

Carrier-specific access codes are not applicable to dedicated leased line service, and Barry believed they are also not applicable to WATS service. In some instances, MCI uses equipment and services provided by local exchange carriers in providing dedicated facilities between the users' premises and MCI's terminal location. Thus, use of dedicated facilities does not always permit the bypassing of local exchange carriers. Barry further stated the majority of WATS customers are "sophisticated telecommunications customers which are in most instances business customers."

To Barry's knowledge, the blocking of local calls is very difficult, and he does not feel MCI has the capability of doing this. Barry did not know if MCI's WATS service involves different technology from that involved in dial one/direct dial service.

Also submitting prepared testimony at the evidentiary hearing was Madelon A. Kuchera, who is director of the Telecommunications Program of the ICC's Policy Analysis and Research Division. Kuchera stated it was not necessary MCI demonstrate its financial, managerial, and technical standing to the ICC in this proceeding, since it had already demonstrated these matters in previous inter-MSA and reseller of service certificate of service authority proceedings. When asked if the introduction of facilities-based intra-MSA competition is in the public interest, Kuchera responded:

> "Yes, the introduction of competition into the intraMSA market will yield more efficient pricing. Competition will ensure that prices better reflect the economic cost of providing the service. In the long run the public will benefit from facilities-based

intraMSA interexchange competition through increased choices of service offerings and the potential for lower prices brought about from increased competition."

Kuchera recommended MCI be granted authority to modify its existing certificate of interexchange service authority "to include the provision of intraMSA interexchange facilities based certificate of service authority."

On cross-examination, Kuchera stated she has done no studies to determine the impact on the primary toll carrier plan of granting MCI an intra-MSA certificate of interexchange service authority. Nor has she done any studies concerning the impact of MCI being granted such a certificate on access charges by local exchange carriers or local exchange rates.

At the evidentiary hearing, MCI, in response to a request of the IITA, agreed to provide a nontechnical description of dialing requirements for the various services contained in MCI's intrastate tariff. In a document filed June 3, 1987, MCI indicated the dialing of access codes is not necessary with respect to dedicated leased line service and WATS service. The dialing of access codes is necessary with respect to the credit card and dial one/direct dial services, except a user of dial one service need not dial an access code if the customer is presubscribed to the service, *i.e.*, has chosen MCI as its "1 +" carrier.

In a supplemental order entered September 30, 1987, the ICC granted MCI a modification of its certificate of interexchange service authority, thereby permitting MCI to provide facilities-based intra-MSA interexchange telecommunications service.

The IITA filed an application for rehearing on November 5, 1987, and GTE filed a petition for rehearing on the same day. On November 24, 1987, the ICC denied both of the above motions.

The IITA and GTE appeal the ICC's September 30, 1987, supplemental order. They assert the order is erroneous and contrary to State law because: (1) it permits MCI to provide intra-MSA interexchange service which uses a dialing arrangement in place July 1, 1985, and does not require the dialing of carrier-specific access codes; (2) the fact it would be technically possible to utilize some of the services which MCI plans to provide on an intra-MSA basis for local calls precludes MCI from offering the services on an intra-MSA basis; and (3) MCI was obligated to establish its providing intra-MSA interexchange service would be in the public interest, and MCI did not establish this. Additionally, the IITA asserts the authority granted to MCI by the ICC's supplemental order is overly broad because it places no limitations on the types of telecommunications services which MCI may pro-

vide or the geographic areas which it may serve.

The parties are not in agreement as to the standard of review applicable to our determination of the above issues.

■ Subsection 10—201(e)(iv) of the Public Utilities Act provides in part:

> "(iv) The [reviewing] court shall reverse a Commission rule, regulation, order or decision, in whole or in part, if it finds that:
>
> A. The findings of the Commission are not supported by substantial evidence based on the entire record of evidence presented to or before the Commission for and against such rule, regulation, order or decision; or
>
> B. The rule, regulation, order or decision is without the jurisdiction of the Commission; or
>
> C. The rule, regulation, order or decision is in violation of the State or federal constitution or laws; or
>
> D. The proceedings or manner by which the Commission considered and decided its rule, regulation, order or decision were in violation of the State or federal constitution or laws, to the prejudice of the appellant." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(e)(iv).)

MCI and the ICC contend the applicable standard is whether the ICC's findings are supported by substantial evidence, based on the entire record of the evidence. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(e)(iv)(A).) The respondents contend, judged by this standard, the record supports the ICC's decision. The IITA and GTE, on the other hand, contend the applicable standard is whether the ICC's decision is in violation of the State and Federal constitution or laws (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(e)(iv)(C)). They assert under this standard, reversal of the ICC's decision is required.

In the present case, there are no significant conflicts in the evidence presented to the ICC. Moreover, the arguments of the parties are premised on the assertions (1) the ICC's supplemental order conferred on MCI authority to provide services which the Protection Law prohibits MCI from providing, and (2) the ICC failed to consider factors which it was required by the Protection Law to consider in acting on MCI's application for modification of its certificate of interexchange service authority. Under these circumstances, our inquiry will focus on the question of whether the ICC's supplemental order violates State law. Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(e)(iv)(C).

■ Also, MCI maintains the construction of ambiguous statutes by the agency charged with their enforcement should be accorded great weight. Where, however, the facts are not in dispute and only legal

issues are involved, reviewing courts are not bound by the ICC's determinations, and those determinations are not entitled to a presumption of correctness. See *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1987), 153 Ill. App. 3d 28, 504 N.E.2d 1367.

## I

The petitioners' first contention involves interpretation of the following portions of the Protection Law. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 13—403.) At the time this case was briefed and argued, section 13—403 read in part:

> "The Commission shall not permit any telecommunications carrier providing interexchange telecommunications service to use intra-Market Service Area dialing arrangements in place July 1, 1985 which do not require the use of telecommunications carrier-specific access codes unless such carrier is also properly certified to offer or provide facilities-based local exchange telecommunications service, prior to a legislative determination to the contrary. The Commission shall conduct a study, and, after notice and hearing, issue a report with findings and recommendations concerning the advisability of permitting a change in the use of such dialing arrangements. Such report shall be submitted to the General Assembly on October 1, 1988." Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—403.

Subsequent to oral arguments in this case, section 13—403 was amended, so that it now reads in part:

> "The Commission shall not permit any telecommunications carrier providing interexchange telecommunications service to use intra-Market Service Area dialing arrangements in place July 1, 1985 which do not require the use of telecommunications carrier-specific access codes unless such carrier was properly certified to offer or provide facilities-based local exchange telecommunications service before July 1, 1985, with the limited specific exception that such carrier-specific access codes are not required for inward calling services terminating on a local exchange access line and for services which employ dedicated (*i.e.*, non-switched) access between the customer's premises and the carrier's facilities. The Commission shall conduct a study, and, after notice and hearing, issue a report with findings and recommendations concerning the advisability of permitting a change in the use of such dialing arrangements. Such report shall be submitted to the General Assembly on October 1, 1990." Pub. Act 85—1161, eff. Aug. 12, 1988; 1988 Ill. Legis. Serv. 1188,

1188 (West); 1988 Ill. Laws 1306, 1306 (amending Ill. Rev. Stat. 1987, ch. 111⅔, par. 13—403).

On the basis of section 13—403 as it existed prior to its 1988 amendment, GTE and the IITA contended MCI could not offer WATS and dedicated leased line services on an intra-MSA interexchange basis, because those services use dialing arrangements in place on July 1, 1985, which do not require the use of carrier-specific access codes. Subsequent to the 1988 amendment of section 13—403, the IITA, in a response to an order of this court to show cause as to why these appeals should not be dismissed as moot, indicated it agrees the issue of whether the ICC's September 30, 1987, supplemental order is contrary to section 13—403 is moot. GTE has not, however, indicated agreement with the IITA's position as to this issue.

■■ ■ When a statute is amended during the pendency of an appeal and prior to the filing of the reviewing court's decision, the case must generally be decided in accordance with the amended version of the statute. (*Rios v. Jones* (1976), 63 Ill. 2d 488, 348 N.E.2d 825.) The record contains uncontradicted evidence MCI's WATS service employs dedicated access lines between the customer's premises and MCI's facilities, and the same is obviously true of MCI's dedicated leased line service. For these reasons, we hold the dialing arrangement requirements of section 13—403 are inapplicable to MCI's WATS and dedicated leased line services, and the ICC's September 30, 1987, order thus does not violate section 13—403.

## II

GTE's and the IITA's argument to the effect the ICC's supplemental order impermissibly allows MCI to provide local telephone service requires interpretation of the following sections of the Protection Law:

" 'Local Exchange Telecommunications Service' means telecommunications service between points within an exchange, as defined in Section 13—206, or the provision of telecommunications service for the origination or termination of switched telecommunications services." Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—204.

" 'Exchange' means a geographical area for the administration of telecommunications services, established and described by the tariff of a telecommunications carrier providing local exchange telecommunications service, and consisting of one or more contiguous central offices, together with associated facilities used in providing such local exchange telecommunications service. To the extent practicable, a municipality, city or village

shall not be located in more than one exchange." Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—206.

"*** No telecommunications carrier offering or providing, or seeking to offer or provide, any local exchange telecommunications service shall do so until it has applied for and received a Certificate of Exchange Service Authority pursuant to the provisions of Section 13—405." Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—401(a).

"The Commission shall approve an application for a Certificate of Exchange Service Authority only upon a showing by the applicant, and a finding by the Commission, after notice and hearing, that:

(a) the applicant possesses sufficient technical, financial and managerial resources and abilities to provide local exchange telecommunications service; and

(b) that the exercise of the Certificate's authority by the applicant would not adversely affect prices, network design, or the financial viability of the principal provider of local exchange telecommunications service.

The Commission shall not approve or issue a Certificate of Exchange Service Authority to more than one telecommunications carrier for any exchange prior to January 1, 1989; provided, however, that a Certificate of Exchange Service Authority may be issued before such time, subject to appropriate Commission approval, pursuant to this Section, to any telecommunications carrier providing predominantly direct nonswitched access service between a customer or user and any telecommunications carrier providing inter-MSA, inter-LATA or inter-state telecommunications service, or between such telecommunications carriers, for the purpose of providing such direct access service." Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—405.

Subsequent to briefing and oral arguments in this case, the Protection Law was amended through the addition thereto of section 13—405.1, which reads:

"Whether or not a telecommunications carrier is certified to offer or provide local exchange telecommunications service, nothing in Section 13—403 or 13—405 shall be construed to require the withdrawal or prevent the offering of interexchange inward calling services terminating on a local exchange access line or interexchange services which employ dedicated (i.e., nonswitched) access between the customer's premises and the carrier's facilities merely because incidental use of such service by

the customer for local exchange telecommunications service is possible without the use of carrier-specific access codes." Pub. Act 85—1161, eff. Aug. 12, 1988; 1988 Ill. Legis. Serv. 1188, 1188-89 (West); 1988 Ill. Laws 1306, 1307.

■ GTE notes the record establishes it might technically be possible for customers to make local telephone calls using MCI's intra-MSA WATS, credit card, and dial one/direct dial services, and MCI does not have a certificate of exchange service authority. Therefore, GTE argues the ICC's order violates section 13—401(a) of the Protection Law, which precludes carriers from offering local exchange telecommunications service until they have received a certificate of exchange service authority. GTE observes section 13—401(a) does not prohibit telecommunications carriers from offering only a significant amount of local exchange telecommunications service without a certificate of exchange service authority, but rather precludes carriers from providing *any* local exchange telecommunications service without such a certificate.

The IITA states the ICC does not have authority to make exceptions to the certificate of exchange service authority requirement of section 13—401(a) for situations where a carrier does not actively market local exchange telecommunications service which it provides, or for cases where there are economic disincentives to the use of such service. The IITA contends this is another instance of the ICC disregarding the plain language of the relevant statutes and substituting its judgment for that of the legislature.

The ICC argues MCI should not be deemed a provider of local exchange telecommunications service because (1) it does not hold itself out as willing to provide local exchange telecommunications service; and (2) there are cost disincentives to the use of intra-MSA services of long-distance carriers for local calling, and the sophisticated user would have very little incentive to use these services for local calls. On this basis, the ICC contends incidental use of MCI's intra-MSA services for local calls would not in any way constitute true local exchange competition.

MCI states (without citation of authority) its tariff provides the use of the services which the ICC's September 30, 1987, order authorizes it to provide is limited to interexchange calling. MCI also argues (again without citation of authority), given the ability of *all* switched access facilities to carry intraexchange traffic, the interpretation of sections 13—401(a) and 13—405 advanced by petitioners would effectively void the entire Protection Law by defeating the ability of interexchange carriers to offer intra-MSA interexchange service of any kind.

US Sprint basically reiterates the arguments of the ICC and MCI

concerning this issue. It also asserts if interexchange carriers were required to seek certification as local exchange carriers, they would presumably be required to provide local exchange telecommunications service to all customers in their service areas who request service after they receive certification. US Sprint contends it is clear the legislature could not have intended this result.

In its reply brief, the IITA states (without citation of authority) MCI's tariff contains a rate for local calls.

■ Before considering the merits of this issue, two preliminary matters need to be addressed. First, the ICC's September 30, 1987, supplemental order states the IITA and GTE contend the granting of MCI's application for intra-MSA interexchange service authority will violate section 13—401 because MCI's WATS and dedicated leased line services could be used to complete local calls. However, both the IITA and GTE simply stated in their replies to the hearing examiner's proposed order, the services which MCI plans to provide pursuant to its request for intra-MSA interexchange service authority will be violative of subsection 13—401(a) because they can be utilized to provide local exchange telecommunications service, and MCI does not possess a certificate of exchange service authority. Thus despite indications in the ICC's supplemental order to the contrary, the petitioners properly presented in the ICC proceedings their contention all services which MCI seeks to provide on an intra-MSA interexchange basis would be in violation of section 13—401(a).

■ Second, both the IITA and MCI refer to portions of MCI's tariff which purportedly relate to usage of MCI's intra-MSA interexchange services for local calls. However, the record contains no tariffs pertaining to MCI's intra-MSA interexchange services. In appeals from ICC orders, the reviewing court must determine the validity of the orders solely on the basis of the record of the proceedings before the ICC, as certified by the ICC. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201(d).) Thus we may not consider the contentions of the parties based on alleged provisions of MCI's tariff pertaining to MCI's intra-MSA interexchange services which are not included in the record.

■ ■ Essentially, local exchange telecommunications service is telecommunications service between two points in the same exchange. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—204.) An "exchange" basically is an area in which local exchange telecommunications services may be used to make a call between two points. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—206.) Section 13—401(a) plainly prohibits telecommunications carriers from providing local exchange telecommunications service until they have applied for and received certificates of exchange

service authority. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—401(a).) However, recently enacted section 13—405.1 creates an exception to this rule with respect to possible incidental use for local calls of (1) interexchange inward calling services terminating on a local exchange access line or (2) interexchange services which utilize dedicated access lines between the customer's premises and the carrier's facilities.

██ As previously indicated, the evidence establishes MCI's WATS service utilizes dedicated access lines, and MCI's dedicated leased line service obviously makes use of dedicated access lines. Thus, under section 13—405.1, any possible use of these services for local calls does not require MCI to obtain a certificate of exchange service authority before offering them.

We reach the same conclusion with respect to MCI's dial one/direct dial and credit card services. MCI is in the business of providing long distance, or interexchange service, as opposed to intra-exchange or local exchange service. MCI's dial one/direct dial and credit card services thus are primarily intended for the delivery of interexchange calls on local exchange access lines, as opposed to the delivery of calls from one telephone to another telephone located in the same exchange. In other words, these two services are "interexchange inward calling services terminating on a local exchange access line." Under the plain language of section 13—405.1, the possible incidental use of these services for calls to telephones within the same exchange does not require MCI to obtain a certificate of exchange service authority.

### III

GTE observes subsection 13—502(a) of the Protection Law provides:

> "All telecommunications services offered or provided under tariff by telecommunications carriers shall be classified as either competitive or noncompetitive. A telecommunications carrier may offer or provide either competitive or noncompetitive telecommunications services, or both, subject to proper certification and other applicable provisions of this Article. Any tariff filed with the Commission as required by Section 13—501 shall indicate whether the service to be offered or provided is competitive or noncompetitive." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—502(a).)

GTE contends among the "other applicable provisions" of the Protection Law which govern carriers providing telecommunications services are the following:

> "With respect to telecommunications services, as herein de-

fined, the General Assembly finds that:

(a) universally available and widely affordable telecommunications services are essential to the health, welfare and prosperity of all Illinois citizens." Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—102(a).

"Consistent with its findings, the General Assembly declares that it is the policy of the State of Illinois that:

\* \* \*

(b) when consistent with the protection of consumers of telecommunications services and the furtherance of other public interest goals, competition should be permitted to function as a substitute for certain aspects of regulation in determining the variety, quality and price of telecommunications services and that the economic burdens of regulation should be reduced to the extent possible consistent with protection of the public interest." (Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—103(b).)

GTE maintains in dwelling on the question of whether MCI possesses the technical, financial, and managerial resources and abilities to provide intra-MSA interexchange telecommunications services (Ill. Rev. Stat. 1985, ch. 111⅔, par. 13—403), the ICC completely ignored the public interest factors which sections 13—102 and 13—103 purportedly require it to consider before permitting competition in telecommunications markets. GTE further asserts the record does not contain substantial evidence which would support a finding MCI being permitted to provide intra-MSA interexchange service would be in the public interest. The IITA essentially reiterates these same arguments.

The ICC in effect asserts the legislature took cognizance of the public policy considerations stated in sections 13—102 and 13—103 in drafting the remainder of the Protection Law, and these prefatory sections of the Protection Law thus do not state factors which the ICC must consider in determining whether to grant certificates of interexchange service authority. The ICC observes section 13—403 of the Protection law provides in part:

"The Commission shall not issue a Certificate of Interexchange Service Authority to more than one facilities-based, interexchange telecommunications carrier for the offer or provision of any intra-Market Service Area interexchange telecommunications service prior to January 1, 1987." (Pub. Act 85—1161, eff. Aug 2, 1988; 1988 Ill. Legis. Serv. 1188, 1188; 1988 Ill. Laws 1306, 1306 (amending Ill. Rev. Stat. 1987, ch. 111⅔, par. 13—403).)

The ICC contends the legislature contemplated the delay in implementation of competition in the intra-MSA market until January 1, 1987,

provided for in section 13—403, would be sufficient to protect consumer interests with respect to intra-MSA interexchange service.

MCI contends that by prescribing in subsection 13—405(b) (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—405) (previously quoted in this opinion) the public interest factors to be considered in granting certificates of exchange service authority, and not specifically providing in section 13—403 the same factors should be considered in granting certificates of interexchange service authority, the legislature indicated an intent public interest factors should not be considered by the ICC in granting certificates of interexchange service authority. MCI asserts that in seeking imposition of a requirement the ICC consider public interest factors in determining whether to issue certificates of interexchange service authority, the petitioners are seeking to alter the plain meaning of the relevant statutes.

In its supplemental order, the ICC held it was not necessary MCI establish its providing intra-MSA interexchange service would be in the public interest in order to be granted authority to provide such service. As its basis for this conclusion, the ICC observed section 13—403 of the Protection Law only requires applicants for permission to provide such service to demonstrate they have sufficient technical, managerial and financial resources to provide the service. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—403.) The ICC also noted the more specific requirements set out in section 13—405 (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—405) regarding applications for exchange service authority and concluded if the General Assembly had intended for the ICC to make findings in addition to those specified in section 13—403 when ruling on applications for certificates of interexchange service authority, it would have spelled out the additional requirements in section 13—403.

Furthermore, the ICC held even if it were to consider the public interest in ruling upon MCI's application for a certificate of intra-MSA interexchange service authority, Ms. Kuchera's testimony established that in the long run the public would benefit as a result of intra-MSA competition by MCI. The ICC also noted GTE and IITA chose to forego their opportunities to present evidence at the hearing on MCI's application, even though information regarding the allegedly harmful effects of competition in the intra-MSA interexchange market was more probably available to them.

■ Prefatory language such as that contained in sections 13—102 and 13—103 of the Protection Law generally is not regarded as being an operative part of statutory enactments. The function of the preamble of a statute is to supply reasons and explanations for the

legislative enactments. The preamble does not confer powers or determine rights. (1A N. Singer, Sutherland on Statutory Construction §20.03, at 81 (Sands 4th ed. 1985).) A declaration of policy contained in a statute is, like a preamble, not a part of the substantive portions of the act. Such provisions are available for clarification of ambiguous substantive portions of the act, but may not be used to create ambiguity in other substantive provisions. See *Brown v. Kirk* (1976), 64 Ill. 2d 144, 355 N.E.2d 12.

■■■ The criteria for granting certificates of interexchange service authority are plainly and unambiguously stated in section 13—403, which provides such certificates are to be issued *only* on the basis of the findings stated therein. Therefore, the statements of public policy contained in sections 13—102 and 13—103 are of no relevance to ICC action on applications for certificates of intra-MSA interexchange service authority.

The above conclusion is not inconsistent with the language of subsection 13—502(a). The "other applicable provisions of this Article" to which that subsection refers include, for instance, those pertaining to the filing of tariffs (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—501), the publication and filing of rates and charges (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—503), and discrimination against other carriers with which joint rates have been established or with whose lines a physical connection has been made (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—702). Thus it is not necessary to interpret sections 13—102 and 13—103 as imposing additional requirements for the issuance of certificates of interexchange service authority in order to give some meaning to the words "other applicable provisions of this Article" contained in subsection 13—502(a).

## IV

We finally consider the IITA's assertion MCI's certificate of interexchange service authority is overly broad because it is unlimited as to the types of intra-MSA services which MCI may offer thereunder and the areas in which MCI may provide intra-MSA interexchange service. The IITA notes Robert Barry testified MCI plans to provide only four services on an intra-MSA basis (dial one/direct dial service, credit card service, dedicated leased line service, and WATS service), and Barry did not know of any plans on the part of MCI to provide other products or services. The IITA also observes MCI does not plan to immediately provide all of these services in all MSA's located in Illinois. The IITA states, without citation of authority, certificated carriers are obligated to provide their services to the public

within their entire certificated areas.

The IITA also notes section 13—401 of the Protection Law provides in part:

> "Any [telecommunications carrier who holds a certificate of public convenience and necessity granted prior to the Protection Law's effective date] *** prior to substantially altering the nature or scope of services provided under a certificate of public convenience and necessity, or adding or expanding services beyond the authority contained in such certificate, must apply for a Certificate of Service Authority for such alterations or additions pursuant to the provisions of this Article.
>
> *** Unless exercised within a period of two years from the issuance thereof, authority conferred by a Certificate of Service Authority shall be null and void." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—401(a).)

The IITA contends the above provisions are evidence of a legislative intent telecommunications carriers only be certificated to provide services which they actually intend to provide in the areas in which they actually intend to provide them. The IITA contends in view of the above provisions, limitation of MCI's certificate of interexchange service authority to the services it presently intends to provide in the areas it presently intends to provide them would not penalize MCI, as it could always seek authority to expand its services pursuant to these provisions. The IITA also states certificates of service authority of the kind here at issue make it impossible for the ICC to know what carriers are providing what services in what areas, and the ICC must have this knowledge in order to effectively regulate the telecommunications industry.

The ICC states its procedures allow carriers to begin serving new areas or to provide new services by amending their tariffs. The ICC also states (without citation of authority) new telecommunications services are not usually made immediately available throughout a carrier's service area but are instead gradually expanded on an exchange by exchange basis. The ICC argues, in essence, there is no reason why the same practices should not be applicable to MCI.

MCI asserts the procedures for adding new services or serving new areas for which the IITA contends are inconsistent with established ICC policy. It also contends these procedures would be inconsistent with the following portion of the Protection Law:

> "No telecommunications carrier shall offer or provide telecommunications service unless and until a tariff is filed with the Commission which describes the nature of the service, ap-

plicable rates and other charges, terms and conditions of service, and the exchange, exchanges or other geographical area or areas in which the service shall be offered or provided. The Commission may prescribe the form of such tariff and any additional data or information which shall be included therein." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—501.)

MCI asserts requiring formal certification proceedings whenever a carrier seeks to serve a new geographical area or provide a new service would drain the resources of both telecommunications carriers and the ICC and would contradict the express legislative intent of lessening regulation of the telecommunications industry when consistent with public policy goals. Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—103.

In its supplemental order, the ICC rejected IITA's argument any certificate granted in this proceeding must be limited to the services which MCI presently intends to provide and to the geographical areas in which it intends to provide them. The ICC noted many local exchange carriers provide additional services only as equipment is upgraded and obtain authority to provide the additional services by the filing of tariffs therefor, as opposed to seeking certification from the ICC to provide the additional services. The ICC stated this procedure is equally applicable to competitive carriers such as MCI.

Although the record contains no evidence concerning the ICC's past practices with respect to telecommunications carriers wishing to provide new services or serve new geographical areas, the aspect of the ICC's order permitting MCI to provide intra-MSA interexchange services throughout Illinois (as opposed to only specific intra-MSA interexchange services in specific areas) does not appear to directly conflict with any portions of the Protection Law or any of the other applicable provisions of the Public Utilities Act. Section 401 does not expressly prohibit issuance of certificates of interexchange service authority allowing a carrier to provide any type of intra-MSA interexchange service on a statewide basis. The two-year expiration period for unexercised certificates of service authority provides no support for the IITA's position. A certificate of service authority containing terms such as that issued to MCI would lapse under this provision only if the carrier provided no service anywhere in Illinois for a two-year period.

Moreover, the requirement carriers file tariffs concerning the services they plan to provide (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—501) undercuts the IITA's argument certificates of service authority such as the one here at issue put the ICC in the position of not

knowing what carriers are providing what services in what areas. All of this information is readily available to the ICC in the tariffs. Also, if a new certificate of service authority would be required whenever a carrier sought to serve a new area or provide a new service, the tariff filing requirement would be largely duplicative and superfluous, for the ICC would already have virtually all of the information required to be included in the tariffs. It should not be presumed the legislature intended to require carriers to file tariffs which serve no useful purpose.

■■ The fact MCI does not plan to immediately serve all MSA's in Illinois with intra-MSA interexchange service also does not provide an independent basis for reversal of the ICC's September 30, 1987, supplemental order. The Public Utilities Act does state:

"Every public utility shall, upon reasonable notice, furnish to all persons who may apply therefor and be reasonably entitled thereto, suitable facilities and service, without discrimination and without delay." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 8—101.)

This provision does not, however, apply to competitive telecommunications rates and services or to the regulation thereof. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—101.) The record establishes the services which MCI currently markets are competitive in nature.

■■ In holding the certificate of intra-MSA interexchange service authority issued to MCI is not overly broad, we note a different set of criteria applies to the granting of certificates of service authority for intra-MSA interexchange service than applies to the granting of certificates of service authority for local exchange service. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—403 (inter-MSA interexchange service); Ill. Rev. Stat. 1985, ch. 111²/₃, par. 13—405 (local exchange service).) We express no view as to whether the ICC could grant a telecommunications carrier a statewide certificate of service authority for local exchange service.

The Illinois Commerce Commission's September 30, 1987, supplemental order is affirmed.

Affirmed.

McCULLOUGH and LUND, JJ., concur.