MONARCH GAS COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION, Appellee.

Fifth District    No. 5—93—0283

Opinion filed April 8, 1994.—Rehearing denied June 7, 1994.

LEWIS, P.J., specially concurring.

Richard J. Day, of Sheafor & Day, of St. Elmo, for appellant.

Roland W. Burris, Attorney General, of Springfield (Ana Cusack Marcyan, Special Assistant Attorney General, of Chicago, of counsel), for appellee.

JUSTICE WELCH delivered the opinion of the court:

Monarch Gas Company (Monarch) appeals a decision of the Illinois Commerce Commission (ICC) ordering it to refund $21,390 in "unauthorized overtake charges" to its customers. These "unauthorized overtake charges" were incurred by Monarch in December 1989 when record-breaking cold temperatures forced Monarch to purchase additional gas from the Natural Gas Pipeline Company of America (NGPCA). On December 12, 1990, pursuant to section 9—220 of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—220), the ICC initiated annual "reconciliation proceedings" of Monarch's 1989 purchased gas adjustment clause (PGAC) revenues. Under section 9—220, the ICC is required to conduct annual public hearings "to determine whether the clauses reflect actual costs of fuel, gas or power purchased[,] to determine whether such purchases were prudent, and to reconcile any amounts collected with the actual costs of fuel, power or gas prudently purchased." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 2—220.) Hearings were conducted on April 10, August 29, and December 10, 1991.

Monarch's general manager, Charles Lowe, testified, *inter alia*, that: (1) Monarch was located near only one major pipeline company, the NGPCA; (2) the next closest pipeline was approximately 25 miles from Monarch's service area; (3) Monarch was a customer of NGPCA under a G-1 tariff for small users; (4) as a G-1 customer, Monarch only paid for gas actually used; (5) Monarch purchased 86.6% of its gas from the "spot market" in 1989; (6) competitive bids were taken each month to ensure that the lowest-cost gas was being purchased;

(7) on December 21, 22, and 23, 1989, Monarch's service area experienced record-breaking cold temperatures; (8) NGPCA curtailed delivery of spot gas to Monarch and denied Monarch's request for authorized overrun gas; (9) because of NGPCA's actions, Monarch purchased system supply gas from NGPCA in excess of the amount authorized for Monarch as a G-1 customer; and (10) Monarch therefore incurred "unauthorized overtake charges in the amount of $21,390.00" in December 1989.

Monarch took the position that it should be permitted to recover the $21,390 from its customers "because it was prudent to incur such charges and there was no other prudent alternative to the purchase of that gas in order to assure the adequate supply of gas to Monarch's customers." On the other hand, Michael Luth, an accountant with the ICC, testified that the $21,390 constituted an unauthorized overtake charge which was not recoverable under section 525.10(c) of the Illinois Administrative Code (83 Ill. Adm. Code § 525.10(c) (1983)) because such charges are classified as "penalties" under the PGAC. In relevant part, section 525.10 provides:

"b) Costs recoverable through the Gas Charge *** and annual reconciliation *** shall include the cost of the following:

1) any solid, liquid or gaseous hydrocarbons purchased for injection into the gas stream, purchased as feedstock or fuel for the manufacture of gas, or delivered to the company under an exchange agreement,

2) storage service purchased under any rate, tariff or contract subject to regulation by a federal or state agency, and

3) transportation costs related to such solid, liquid or gaseous hydrocarbons and storage service.

c) The cost of the foregoing items shall exclude demurrage charges and penalty charges including but not limited to charges for late payment and unauthorized overruns and lost discounts." 83 Ill. Adm. Code §§ 525.10(b), (c) (1983).

Luth recommended that Monarch be required to refund the $21,390 to its customers. On February 24, 1993, the ICC issued an order concluding: "[The] unauthorized overtake charges in the amount of $21,390 are not recoverable under the Uniform [PGAC]. Section 525.10(c) precludes the recovery of penalty charges for unauthorized overruns." The ICC therefore ordered Monarch to refund the $21,390 to its customers. In a concurring opinion, one of the commissioners eloquently summarized the nature of this case:

"I agree *** that under § 525.10(c) of the Uniform [PGAC], 83 Ill. Adm. Code 525 ('the Statute') Monarch Gas Co. ('the Company') cannot recover the $21,390 in unauthorized overtake charges.

However, I believe that the Statute is unfair and will discourage utilities from pursuing their least cost options in the future.

Under the Statute, the Company can only recover gas costs excluding penalty charges—included but not limited to charges for unauthorized overruns. Thus, given the language of the Statute and the fact that none of the parties contest that the $21,390 are unauthorized overtake charges, the Commission cannot allow Monarch to recover these costs. *** During record-breaking cold temperatures and after curtailment of *** gas by [NGPCA], Monarch had to exceed the maximum daily quantity authorized *** in order to provide gas for residential space heating and other customer energy demands. *** Only by electing to become a Daily Maximum Quantity (DMQ) customer of [NGPCA][ ] could Monarch have avoided the unauthorized overtake charges. However, becoming a DMQ customer would have resulted in a 100% increase in gas costs to customers according to Monarch. Thus Monarch chose the prudent least cost option.

In denying Monarch recovery ***, the Commission is punishing the utility for acting prudently. As the Company noted, this sends the illogical message that utilities should avoid these charges at all cost—even if incurring them would be the least cost option. As a result the utility will pursue more expensive options, and the increased costs will simply be passed on to ratepayers. In short, ratepayers will ultimately pay for a statute that punishes prudent utility actions. Only by amending the statute to allow utilities that choose least cost strategies recovery of prudently incurred expenses will ratepayers avoid such a fiasco."

Monarch now appeals and raises the following issues: (1) whether the decision of the ICC violates the due process clauses of the United States Constitution and the Illinois Constitution by taking the utility's property without due process of law; (2) whether the ICC applied its regulations contrary to statutory intent and in such a manner as to violate Monarch's due process rights; and (3) whether the order of the ICC violates public policy.

Before turning to the merits of this case, it is necessary to review the applicable standards of review. First, the "rules, regulations, orders or decisions of the [ICC] shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the [party] appealing." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(d).) Second, reviewing courts are limited to a determination of whether: (1) the ICC acted within the scope of its authority; (2) the ICC made findings in support of its decision; (3) the findings have substantial support in the record; and (4) constitutional rights have been violated. (Ill. Rev. Stat. 1989, ch. 111²/₃, pars. 10—201(e)(iv)(A)

through (e)(iv)(D); *Monarch Gas Co. v. Illinois Commerce Comm'n* (1977), 51 Ill. App. 3d 892, 894-95, 366 N.E.2d 945, 947.) Third, it is well settled that great weight and deference should be accorded to the decisions of the ICC. (See, *e.g., Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n* (1960), 19 Ill. 2d 436, 442, 167 N.E.2d 414, 417; *State Public Utilities Comm'n ex rel. City of Springfield v. Springfield Gas & Electric Co.* (1919), 291 Ill. 209, 216, 125 N.E. 891, 895.) Fourth, administrative rules and regulations "must be construed under the same standards which govern construction of statutes," and like a statute, administrative rules and regulations "enjoy a presumption of validity." (*Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 58, 387 N.E.2d 320, 323.) Fifth, a reviewing court "may set aside administrative regulations only if they are clearly arbitrary, capricious or unreasonable." (*Midwest Petroleum Marketers Association v. City of Chicago* (1980), 82 Ill. App. 3d 494, 501, 402 N.E.2d 709, 715; see also *Rend Lake College Federation of Teachers, Local 3708 v. Board of Community College, District No. 521* (1980), 84 Ill. App. 3d 308, 311, 405 N.E.2d 364, 368 ("[r]eviewing courts may interfere with the construction and application of regulations only where administrative interpretation is *plainly erroneous*" (emphasis added)).) Lastly, the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 1—101 *et seq.*) " 'does not authorize a court to put itself in place of the [ICC] and *** substitute its judgment for that of the [ICC].' " *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 469, 303 N.E.2d 364, 369, quoting *Produce Terminal Corp. v. Illinois Commerce Comm'n ex rel. Peoples Gas Light & Coke Co.* (1953), 414 Ill. 582, 589, 112 N.E.2d 141, 144; see also *Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523, 165 N.E.2d 329, 331 ("the wisdom of the decision of the [ICC] is not open to inquiry").

Monarch is correct in its observation that this is a case "where blind adherence to a regulation by its bureaucratic administrators works a great injustice." This case boils down to the fact that Monarch, in an effort to provide gas to its customers during a record-breaking cold spell, opted to pursue the least costly route in order to obtain a necessary supply of additional gas. We will address each of Monarch's arguments in order.

■ Monarch argues that the ICC's order "inequitably confiscates Monarch['s] *** property in the amount of $21,390 without due process of law in violation of the 14th Amendment *** and Article I, Section 2 of the [Illinois Constitution]." Monarch attempts to buttress its argument by citing *Sprague v. Biggs* (1945), 390 Ill. 537, 62 N.E.2d 420, and section 1—102(a)(iv) of the Public Utilities Act (Ill. Rev.

Stat. 1989, ch. 111²/₃, par. 1—102(a)(iv)). Neither source, however, provides any support for Monarch's due process argument. In *Sprague*, our supreme court held that base rates which do not produce income sufficient to meet the *operating expenses* of a public utility are confiscatory. (Emphasis added.) (*Sprague*, 390 Ill. at 562-63, 62 N.E.2d at 432.) In other words, under *Sprague*, an ICC order would be "confiscatory" only where it sets the base rate at such a low level that the utility is unable to pay its operating expenses. Because Monarch has presented no such evidence (*i.e.*, that its rates are insufficient to meet operating expenses), *Sprague* has no application whatsoever to this case.

Section 1—102 of the Public Utilities Act is nothing more than prefatory. As such, it is of no substantive or positive legal force:

> "Prefatory language *** generally is not regarded as being an operative part of statutory enactments. The function of the preamble of a statute is to supply reasons and explanations for the legislative enactments. The preamble does not confer powers or determine rights. [Citation.] A declaration of policy contained in a statute is, like a preamble, not a part of the substantive portions of the act. Such provisions are available for clarification of ambiguous substantive portions of the act, but may not be used to create ambiguity in other substantive provisions." *Illinois Independent Telephone Association v. Illinois Commerce Comm'n* (1988), 183 Ill. App. 3d 220, 236-37, 539 N.E.2d 717, 726.

Monarch's basic underlying contention is that "since the costs incurred were prudent and reasonable, [it] should be allowed to recover those costs from its ratepayers." The resolution of this issue, as correctly stated by the ICC, is found in section 525.10(c) of the Illinois Administrative Code (83 Ill. Adm. Code § 525.10(c) (1983)). While the costs incurred by Monarch may well be "reasonable and prudent," the ICC's decision not to allow Monarch to recover them does not offend due process. Monarch has cited no case, nor can we find any, that would support its argument that the ICC order entered in the instant case is violative of due process. In short, we are completely unpersuaded by Monarch's bare assertion that the ICC order violates due process.

As to Monarch's second argument, a hybrid of due process and statutory intent, we are likewise unpersuaded. In essence, Monarch asserts that subsequent changes in the natural gas market have rendered section 525.10(c) obsolete. According to Monarch, the ICC "failed to reconsider the [PGAC] in light of [a] change in circumstances which has occurred in the natural gas supply system since the advent of open access." What Monarch is requesting from this

court is for us to judicially repeal or amend an ICC regulation. This we will not do. If section 525.10(c) needs changing to bring it "in line with the times," it is the job of the ICC and not this court to change, repeal, or promulgate a new regulation. See generally *Chemed Corp. v. State of Illinois* (1989), 186 Ill. App. 3d 402, 410, 542 N.E.2d 492, 497 (appellate court should not set aside agency policy merely because it is deemed unwise or inappropriate); *Midwest Petroleum Marketers*, 82 Ill. App. 3d at 501, 402 N.E.2d at 715 (appellate court is not empowered to disturb administrative decisions merely because different regulations may be more feasible or even wiser).

Monarch's last argument is a broad-based public policy argument that the decision of the ICC will result "in an unwarranted increase in utilit[y] rates in violation of statutorily declared public policy to promote least cost rates." To support its argument, Monarch relies on section 1—102(a) of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 1—102(a)), which declares as one objective of regulation the "provision of reliable energy services at the least possible cost to the citizens of the State." As previously discussed, however, this part of the Public Utilities Act is merely prefatory or declaratory language that, like a preamble, is of no substantive or positive legal force.

Additionally, even if the general declaratory language of section 1—102(a) is construed to contain an enforceable declaration of public policy, it would make little difference. A cardinal rule of statutory construction is that "where there exists a general statutory provision and a specific statutory provision, either in the same or another act, which both relate to the same subject, the specific controls and should be applied." *(People v. Villarreal* (1992), 152 Ill. 2d 368, 379, 604 N.E.2d 923, 928; see also *Natural Products Co. v. County of Du Page* (1924), 314 Ill. 74, 80-81, 145 N.E. 298, 300.) The ICC's regulations have the force and effect of a statute. (See, *e.g.*, *Sawyer Realty Group, Inc. v. Jarvis Corp.* (1982), 89 Ill. 2d 379, 384-85, 432 N.E.2d 849, 851; *Acker v. Department of Revenue* (1983), 116 Ill. App. 3d 1080, 1084, 452 N.E.2d 798, 801.) By stressing section 1—102(a) (the general) over section 525.10(c) (a specific ICC rule properly promulgated pursuant to its express rulemaking authority under section 9—220 of the Public Utilities Act), Monarch violates the aforementioned long-standing rule of statutory construction that particular provisions prevail over general.

■ Notwithstanding the foregoing, this court is convinced that the concurring commissioner was correct when she stated that section 525.10(c): (1) "[is] unfair and will discourage utilities from pursuing their least cost options in the future"; (2) "punish[es] the utility for

acting prudently"; and (3) "sends the illogical message that utilities should avoid these charges at all cost—even if incurring them would be the least cost option." The bottom line is that the ICC's order, in light of the facts of this case, is unreasonable.

For Monarch to have done what was necessary to avoid the "penalty charge" (*i.e.*, become a DMQ customer of NGPCA) would have resulted in its customers' rates being increased 100%. Monarch not only did "the right thing," but its actions evidence concern for its customers and its considerable business acumen. As a reviewing court, we "may set aside administrative regulations only if they are clearly *** unreasonable." (*Midwest Petroleum Marketers Association v. City of Chicago* (1980), 82 Ill. App. 3d 494, 501, 402 N.E.2d 709, 715.) Similarly, we will set aside an administrative order where, as here, it is clearly unreasonable. To affirm the ICC's order, based on the particular facts of this case, would be clearly unreasonable.

For the foregoing reasons, we hereby reverse the order of the Illinois Commerce Commission.

Reversed.

MAAG, J., concurs.

PRESIDING JUSTICE LEWIS, specially concurring:

I concur in the majority opinion, but I have two additional reasons. I do not want to get carried away, but I agree with the majority that the law should occasionally make sense.

Here, we have a company that saved its customers 100% on their gas bills at the expense of the company's stockholders and, possibly, management, if management received a bonus on profits (*e.g.*, the company is allowed a profit on gross sales, which sales, and thus the profits and bonuses, would be increased tremendously by the company becoming a daily maximum quantity (DMQ) customer as opposed to buying on the spot market). Now, we are asked to penalize the company for acting against its own self-interest and following the public policy set forth in section 1—102(a) of the Public Utilities Act "to meet their customers' demands for public utility services at the least cost. (Ill. Rev. Stat. 1989, ch. 111$^2$/$_3$, par. 1—102(a).) By affirming the ICC decision, we would be encouraging or even forcing companies to strictly adhere to regulatory agencies' rules regardless of the fact that in given circumstances the strict adherence to the rules might cause people to be hurt or killed, our environment polluted, or the public to suffer monetary losses.

The ICC, in its brief, practically admitted that the rule was out of

date, nonsensical, and costly to the utility customers under the circumstances of this case and most likely in similar circumstances involving other small gas utilities. The ICC argues that its rule was reasonable when promulgated and, therefore, it must be strictly adhered to. If this reasoning were followed, then no doubt trains would have to stop at crossings in many towns that have not updated their ordinances so that the horses could cross the tracks.

The fact is that section 1—102(a) sets forth the public policy that the ICC regulations should meet the demands of the customers of utilities at the least cost. This may be prefatory or general language, but it is the intent of the legislature, which gives us some direction in interpreting specific statutes under the Public Utilities Act and the rules promulgated by the ICC and gives a basis for determining whether the ICC's rules and regulations are unreasonable.

The intent of the legislature as shown in section 1—102(a) aids us, therefore, in interpreting the specific statute, section 9—220, which states that "[a]nnually, the Commission shall initiate public hearings *** to determine whether such purchases were *prudent*, and to reconcile any amounts collected with the actual costs of fuel, power or gas *prudently* purchased." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—220.) The specific law contained in section 9—220 is not in conflict with section 1—102(a), because it should be apparent that being prudent would require Monarch to buy its gas at the least cost, unless there are exceptional circumstances not in the record, so that Monarch could pass on the savings to its customers. "Prudence" and "least cost" might be mutually exclusive terms or even a foreign language to most governments, but surely we are not going to force the private sector to act like the government. The ICC would have us hold that meeting the customers' demands at the least cost is not the same as being prudent. Prudence, according to the ICC interpretation of the law, means buying at the highest possible cost and then socking it to the consumer.

The only thing that is out of sync with section 1—102(a) is the ICC's interpretation of its rule contained in section 525.10. (83 Ill. Adm. Code § 525.10 (c) (1983).) This rule, as interpreted by the ICC, forces Monarch, by not allowing a deduction for any additional costs incurred in buying on the spot market in unusually cold years, to buy its gas at the highest cost and to charge those higher costs to their customers.

It appears to me that the ICC was not acting within the scope of its authority by reason of its violation of section 9—220 in failing "to reconcile any amounts collected with the *actual* costs of fuel *** prudently purchased." (Emphasis added.) (Ill. Rev. Stat. 1989, ch.

111²/₃, par. 9—220.) Further, the ICC is definitely not following the policy or intent of the legislature in forcing small gas companies to charge their customers 100% more than is possible, if the company acted "prudently." We cannot say or hold that a decision that is indirect conflict with the statutes is legal.

It should be noted that the reason that I italicized *actual* in the preceding paragraph is because the actual cost of fuel under the circumstances of this case would include the additional "penalty charges." Section 525.10(c) states that the costs of gas "shall exclude demurrage charges and penalty charges included but not limited to charges for late payment and unauthorized overruns and lost discounts." (83 Ill. Adm. Code § 525.10(c) (1983).) There is no reason why the "penalty" incurred by Monarch should be considered an "unauthorized overrun," when the ICC knows that the "overrun" due to exceptionally cold weather will be less than the difference in the cost of contracting for a daily maximum amount and buying on the spot market. Just because the pipeline company labels a purchase an unauthorized overrun does not mean that the ICC has to consider the overrun unauthorized. Unauthorized by whom, the pipeline company or the ICC? By using a little ingenuity, the ICC could have interpreted its rule so that it complied with sections 1—102(a) and 9—220. The decision of the ICC was, therefore, plainly erroneous, because it misinterpreted its rule by placing it in conflict with sections 1—102(a) and 9—220. *Rend Lake College Federation of Teachers, Local 3708 v. Board of Community College, District, No. 521* (1980), 84 Ill. App. 3d 308, 405 N.E.2d 364.

Accordingly, I agree that the ICC decision should be reversed, but on the additional grounds that under the ICC interpretation of section 525.10(c) the ICC exceeded its authority by enforcing an interpretation of a rule that is in direct conflict with sections 1—102(a) and 9—220 and that the ICC interpretation of its own rule was plainly erroneous.