DECISION
Before this Court is an appeal from a decision by the Rhode Island Department of Business Regulation (DBR) pursuant to G.L. 1956 § 42-35-15
of the Administrative Procedures Act (APA). See Decision, HeritageHealthcare Servs., Inc. v. The Beacon Mutual Insurance Co., DBR No. 05-I-0156, July 25, 2006 (DBR Decision).
Plaintiff appeals from the denial of its requests that the DBR (1) conclude that the phrase "lowest possible price" contained in Defendant/Intervenor The Beacon Mutual Insurance Company's (Beacon) enabling legislation,[1] allows for a private cause of action against Beacon; (2) order that the capital used by Beacon to form Castle Hill Insurance Company, a wholly owned subsidiary, be returned to Beacon's policyholders in the form of a dividend; and (3) find that Beacon violated G.L. 1956 § 27-9-51 regarding "excess profits." *Page 2 
 I Facts and Travel
Beacon was established by the legislature in order to provide workers compensation insurance to employers in Rhode Island. Pub.L. 2003, ch. 410, § 3(a). The fund is a "non-profit independent public corporation for the purpose of insuring employers" under the relevant workers compensation laws, and is Rhode Island's "workers' compensation carrier of last resort." Id. At the end of 2005, policies issued by Beacon accounted for approximately 74.8% of the workers compensation insurance in Rhode Island as measured by premium volume. (DBR Decision 26.)
Plaintiff Heritage Healthcare Services, Inc. (Heritage) was one of the many Rhode Island employers which obtained its workers compensation insurance from Beacon. Heritage generally claims that Beacon overcharged for its policies and misspent its funds. It now seeks remuneration under various statutes and legal theories. Heritage was a policyholder of Beacon from December 1993 to December 1995 and again from September 1999 to September 2002. (DBR Decision 16.)
Heritage is also a plaintiff in a putative class action suit before this Court which similarly claims harm from the pricing practices of Beacon, and which has resulted in three written rulings from this Court.[2] This Court will hear a motion for class certification in that case later this year.
Heritage brought its first two administrative claims in the form of a consumer complaint to the DBR, which declined to take any action on the complaint. (DBR *Page 3 
Decision 1.) Heritage then requested an appeal to the Director of the DBR, and the DBR decided to treat the complaint as a petition for declaratory relief under § 42-35-8 of the APA. Id. at 1-2. While that proceeding was pending, this Court decided that the "lowest possible price" issue was properly addressed by the DBR in the first instance.Id. at 2. Therefore, Heritage filed an amended complaint on October 7, 2005, and that claim was added to the administrative proceeding pending before the DBR. Id.
On July 25, 2006, the DBR denied each of Heritage's requests for relief. Heritage brought a timely appeal, and the Court will now consider whether the DBR erred in denying each of Heritage's claims.
 II Standard of Review
Any person aggrieved by a final order of an agency in a contested case is entitled to judicial review pursuant to § 42-35-15(a).[3] Except in limited circumstances not applicable here, the Court's review is confined to the record before the agency. See § 42-35-15(f). The Court may affirm the agency decision, or it can remand the case for further proceedings before the agency. Section 42-35-15(g). The Court may also reverse or modify the decision if substantial rights of the appellant have been prejudiced because the agency's findings or conclusions are
 "(1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law; *Page 4 
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." See § 42-35-15(g).
The Court will not substitute its own judgment for that of the agency on questions of fact, but must defer to the agency's conclusions unless clearly erroneous. Id.
 III Lowest Possible Price
The pertinent statutory text provides that "[t]he purpose of the fund[4] is to ensure that all employers in the state of Rhode Island have the opportunity to obtain workers' compensation insurance at the lowest possible price." Pub.L. 2003, ch. 410, § 3(a). Heritage's brief does not clearly state the relief that it requested from the DBR, and that it now seeks from this Court. However, DBR viewed the issue before it as a request by Heritage "for a statement that the phrase `lowest possible price' allows for a private cause of action" against Beacon. (DBR Decision 28.) DBR declined to grant the request. Heritage now asks this Court to correct DBR's allegedly erroneous interpretation of the phrase, after which "it will be appropriate for this issue to be litigated in the pending class action on behalf of all Beacon's policyholders." (Pl's Mem. Supp. App. 15, Jan. 22, 2007.) Presumably, Heritage will then attempt to prove that Beacon has misspent its funds in violation of its mandate to charge "the lowest possible price."[5]
Before analyzing whether Heritage is entitled to the requested declaration, the Court must put Heritage's request into context. Heritage is currently a plaintiff in a *Page 5 
pending civil action against Beacon. In that action, Heritage (and other plaintiffs) had sought to enforce the same "lowest possible price" language as a breach of contract, since "[p]ublic corporation charters create a contract between the public corporation and its shareholders."Heritage Healthcare Servs. Inc. v. The Beacon Mut. Ins. Co., 2005 R.I. Super. LEXIS 140, *15 to *16 (R.I.Super. Aug. 29, 2006) (Silverstein, J.) (citing In Re Nat'l Mills, 133 F.2d 604, 609 (7th Cir. 1943)). However, this Court dismissed the claim based on the doctrine of primary jurisdiction, because "the legislature clearly intended that the DBR" determine the meaning of "lowest possible price." HeritageHealthcare Servs. v. Beacon Mut. Ins. Co., 2005 R.I. Super. LEXIS 140, *16 to *17 (R.I.Super.Ct. 2005).
The Court reasoned that
 "[t]he price of worker's compensation insurance is derived by a complicated process that is based in large part on the rate setting procedures of the DBR. Beacon's charter provides that Beacon `shall be subject to rate regulation under chapter 7.1 of title 27.' P. L. 2003, ch. 410
§ 11 (c) (1). Under that chapter, workers' compensation insurance companies must file their risks and premium rates with the director of DBR." Id.[6]
DBR then makes a determination as to whether those rates are "excessive, inadequate, or unfairly discriminatory" after considering various factors identified in G.L. 1956 § 27-7.1-4.1.[7] Id. DBR also has the power to remedy any violations found. See G.L. 1956 § *Page 6 42-14-16 (giving DBR the power to revoke licenses, issue cease and desist orders, and levy penalties). Therefore, this Court stated that "[r]esolution of the meaning of [lowest possible price] lies in the first instance with the DBR because it is the agency charged with the enforcement of the provision. Heritage Healthcare Servs. v. Beacon Mut.Ins. Co., 2005 R.I. Super. LEXIS 140, *18 (citing Labor Ready Northeast,Inc. v. McConaghy, 849 A.2d 340, 345 (R.I. 2004)). "Once the DBR has applied its superior expertise to the question, its determination will be entitled to due deference by this Court." Id.[8]
Following this Court's August 29, 2006 decision, Heritage proceeded to seek a declaration from the DBR that the "lowest possible price" language did in fact afford it a private cause of action — despite having such a claim dismissed from its pending civil action. DBR rejected Heritage's request because it believed that "it was not the legislatures' [sic] intent" that the "lowest possible price" language in Beacon's enabling statute create a private cause of action against Beacon. (DBR Decision 22.) "Rather, inclusion of this language was a grant of jurisdiction to the [DBR] to review the manner of calculation of the rate of an individual employer. . . ." Id.
The Court disagrees slightly with the DBR's reasoning, but ultimately agrees with its decision to deny Heritage's request. The "lowest possible price" language does not confer any sort of regulatory jurisdiction upon DBR. DBR does have regulatory authority over Beacon's rates; however, that authority simply derives from another portion of Beacon's enabling statute. See Pub.L. 2003, ch. 410, § 11(c)(1) ("Except as *Page 7 
provided in subsection (d), the fund shall be subject to rate regulation under chapter 7.1 of title 27").
The "lowest possible price" language is merely a statement of policy or purpose, which is common in many statutes, but which does not itself create substantive rights:
 "The general rule of statutory construction is that policy declarations in statutes, while useful in gleaning the purpose of the statute, are not, of themselves, a substantive part of the law which can limit or expand upon the express terms of the operative statutory provisions." Poe v. Haw. Labor Rels. Bd., 97 Haw. 528, 540
(Haw. 2002).
Compare Pub.L. 2003, ch. 410, § 3(a) ("The purpose of the fund is. . . . It is also the policy and purpose of this act to. . . ."). Heritage argues that any contrary interpretation — concluding that the disputed provision does not provide a private cause of action — would render the disputed language superfluous in violation of an oft-cited canon of statutory construction. See, e.g., Brennan v. Kirby, 529 A.2d 633, 637
(R.I. 1987) (stating that legislative enactments may not "be construed, if at all possible, to render sentences, clauses, or words surplusage").
However, such provisions do serve important functions even if they do not create substantive rights. Statements of policy or purpose inform administrators and courts of the purposes of legislation, since they usually have not participated in drafting such legislation.Sutherland Statutory Construction § 20.12 (5th ed. 1993). They are also available "for clarification of ambiguous substantive portions of the act." Illinois Independent Tel. Asso. v. IllinoisCommerce Com., 539 N.E.2d 717, 726 (Ill.App.Ct. 1988). Therefore, the "lowest possible price" language is not mere surplusage even if it does not itself create a cause of action. *Page 8 
Rather, when read in the context of the entire statute creating Beacon, the role of the policy or purpose statement is clear.See, e.g., Rhode Island Bd. of Governors for Higher Educ. v.Newman, 688 A.2d 1300, 1302 (R.I. 1997) (finding that a Court must endeavor to ascertain the legislative intent, "examin[ing] the statute in its entirety and then the individual provisions in the context of the whole, not as if each provision were independent of the whole.") The purposes of Beacon's enabling act is to provide Rhode Island employers with workers compensation insurance at the "lowest possible price" and to establish Beacon as the workers compensation insurance carrier of last resort. Pub.L. 2003, ch. 410, § 3(a). That purpose is accomplished by the other sections of the act which, inter alia, define Beacon's organizational structure, §§ 4, 7, 12, enumerate its powers, §§ 5, 6, 10, 13, and subject it to regulatory oversight, § 11. By expressly subjecting Beacon to rate regulation under chapter 7.1 of title 27 — subject to certain modifications and exclusions — the legislature clearly intended to use the existing regulatory scheme as a means to ensure the "lowest possible price."
However, standing alone, the statement of purpose does not create substantive rights which may be enforced by courts or by an agency. Therefore, the DBR was correct in its conclusion that Heritage may not bring a private cause of action against Beacon based upon the "lowest possible price" language. In fact, the Court thought that it had decided as much in its August 29, 2005, decision dismissing Heritage's claim and referring it to DBR to seek redress.
As the DBR correctly notes in its decision, Heritage does have a remedy with the DBR that is clearly set forth in chapter 7.1, title 27. In addition to the regulatory oversight accomplished through filing rates with the DBR, any person aggrieved by the *Page 9 
application of an insurer's rating system may seek a hearing before the insurer. Section 27-7.1-11.1(a); see Pub.L. 2003, ch. 410, § 11(c)(1) (making the aforementioned statute applicable to Beacon). The standards used for determining the appropriateness of the rate are found in §27-7.1-4.1, which provides inter alia that rates shall not be excessive, inadequate, or unfairly discriminatory. Section 27-7.1-4.1(b)(vi) also provides for consideration of "all other relevant factors within and outside this state" which would include Beacon's non-profit status, any excessive surpluses accumulated, and its charge to provide insurance at the "lowest possible price."
If Heritage shows that its rates were excessive, then it will be entitled to a refund of any overcharge. Section 27-7.1-11(d). Any adverse decision may then be appealed to the Director of the DBR. Sections 27-7.1-11.1(b)-(c).[9] The Director's decision is also reviewable under the APA if Heritage is unsatisfied with the DBR's resolution of its grievances. See § 42-35-15(a) (providing for review, after exhaustion of administrative remedies, of any final order by an agency in a contested case); DBR Decision 25 (confirming the applicability of the APA to such appeals).
In fact, it appears that Heritage has already instituted such proceedings and that they are still pending before DBR. (DBR Decision 25 n. 15, 26.) Since Heritage has an administrative remedy and is actively pursuing that remedy, it is unclear why Heritage persists in its reliance upon the "lowest possible price" language. However, it is clear that DBR correctly denied Heritage's requested declaration, and the Court will affirm its decision on that issue. *Page 10 
 IV Out of State Insurance and Establishment of Castle Hill
Beacon has engaged in so-called "fronting" arrangements with out-of-state insurance companies as a means to insure the out-of-state employees of Rhode Island employers. Prior to 2003, the Fairfield Insurance Company was Beacon's primary fronting partner. In 2003, Fairfield indicated its intent to discontinue the fronting arrangement with Beacon. Therefore, Beacon established a wholly-owned subsidiary called Castle Hill Insurance Company (Castle Hill) and capitalized it with approximately $20 million. It was anticipated that Castle Hill would then engage in a fronting arrangement with Beacon to continue insuring the risks of out-of-state employees of Rhode Island employers.
DBR describes a fronting arrangement as a "common practice in the insurance industry" which allows an insurer, which is licensed in one state, to insure risks occurring in another state in which it is not licensed. (DBR Decision 16-17.)
 "Under a fronting arrangement, a licensed carrier writes the insurance on its name and on its own policy form and cedes back the risk to the assuming carrier. In exchange, the assuming carrier assumes all responsibility for gains and losses under the contract after payment of a "fronting fee" to the fronting company. Nothing in the law prohibits a fronting arrangement." Id. at 16.
Therefore, a fronting arrangement allows an insurer to insure out-of-state risks without meeting the requirements and incurring the expenses of gaining a license in that other state.[10] *Page 11 
Heritage objects to both the prior fronting arrangement with Fairfield and the establishment of Castle Hill using approximately $20 million from Beacon's assets. It seeks to have the capital used to form Castle Hill returned to Beacon's policyholders in the form of a dividend. DBR found Heritage's claim to be without merit for several reasons. It found that Beacon's enabling statute impliedly granted it the power to create a subsidiary for the purpose of insuring out-of-state employees of Rhode Island employers.[11] The DBR further found that domestic insurers are specifically permitted to invest in subsidiary companies, see G.L. 1956 § 27-11.1-4, and that doing so is in furtherance of Beacon's statutory purpose to provide insurance to Rhode Island employers.
Before addressing the merits of Heritage's claims, this Court has an obligation to determine whether Heritage even has standing to challenge the establishment of Castle Hill, because that question affects the jurisdiction of this Court to decide the issue. See DBR Decision 16 (questioning whether Heritage has such standing). Under the APA, only an "aggrieved" party is entitled to judicial review. Section 42-35-15(a). Moreover, it is well-settled law in Rhode Island that the existence of an actual controversy is a prerequisite to the exercise of judicial power. See, e.g., State v. Lead Indus. Ass'n, 898 A.2d 1234, 1238 (R.I. 2006) (stating that the courts should not "issue advisory opinions or rule on abstract questions"). *Page 12 
Standing is "an access barrier that calls for the assessment of one's credentials to bring suit." See, e.g., Blackstone Valley Chamber ofCommerce v. Public Utils. Comm'n, 452 A.2d 931, 932 (R.I. 1982). It is a separate inquiry from whether the person is entitled to relief on the merits, and the basic requirement is that a plaintiff must have alleged "such a personal stake in the outcome of the controversy as to ensure concrete adverseness that sharpens the presentation of the issues upon which the court depends for an illumination of the questions presented."Id. at 933 (citing Baker v. Carr, 369 U.S. 186 (1962)).
Stated differently, the Plaintiff must have alleged a sufficient "injury in fact" to be entitled to a determination on the merits.Associated Builders Contrs. of R.I. v. Dep't of Admin., 787 A.2d 1179,1185 (R.I. 2002) (noting that the line is not between "a substantial injury and an insubstantial injury," but rather, between "injury and no injury") (citations omitted). Such an injury must be "concrete and particularized" and "actual or imminent," and not merely "conjectural or hypothetical." Meyer, 844 A.2d at 151.
In order to assess Heritage's standing, the Court will assumearguendo that it was improper for Beacon to cause the creation of Castle Hill, and to capitalize it with approximately $20 million of its funds. The Court will further assume that the policyholders of Beacon are entitled to an order compelling Beacon to pay a dividend representing the return of that $20 million. The record indicates that Castle Hill was authorized and formed no earlier than October 2003. (DBR Decision 16 Appendix.) However, Heritage ceased being a policyholder of Beacon in September 2002. *Page 13 
Therefore, Heritage would not be entitled to any dividend owing to Beacon's policyholders, and it has suffered no harm from the creation of Castle Hill.[12]
That Heritage ceased to be a policyholder of Beacon over a year before the creation of Castle Hill is fatal to its claim because this Court is prohibited from issuing advisory opinions on abstract questions of law. The creation of Castle Hill has not caused Heritage any "injury-in-fact" that could be redressed by the requested relief. Therefore, the Court will affirm the decision of DBR which declined to issue any relief with respect to Castle Hill.
 V Excess Profits Statute
Heritage's last claim for relief involves the so-called "excess profits" statute found at G.L. 1956 § 27-9-51. The statute provides that each "insurance group shall" annually provide to the DBR "the following data for workers' compensation and employers' liability insurance." Section 27-9-51(a) (emphasis added). It then lists four categories of information — the calendar year earned premium, accident and loss adjustment costs, administrative expenses, and policyholder dividends — which must be reported. Id.
Excess profits are found by comparing the "underwriting gain" with the "anticipated underwriting profits" in the relevant time periods. These terms are defined by the statute, which sets forth a fairly mechanical computation of excess profits. *Page 14 
Underwriting gain (or loss) is computed by subtracting accident costs,[13] adjustment expenses, administrative expenses, and policyholder dividends from the premiums earned by the insurer.See § 27-9-51(b)(4). "Anticipated underwriting profit" can roughly be described as earned premiums multiplied by a "percentage factor" for profit and contingencies. See § 27-9-51(b)(2).[14] The "percentage factor" is found in the rate filings that insurers submit to DBR.Id. Excess profits have been realized "if the underwriting gain is greater than the anticipated underwriting profit plus five percent (5%) of earned premiums for the three (3) most recent calendar years." Section 27-9-51(b). If an excess profit has been realized, then DBR
 "shall order a return of the excess amounts after affording the insurance group an opportunity for a hearing and complying with the provisions of the [APA]. The excess amounts shall be refunded in all instances unless the insurance group affirmatively demonstrates to the department that the refund of the excess amounts will render the insurance group insolvent under the provisions of this title." Section 27-9-51(f) (emphasis added).
Therefore, if underwriting gains exceed the anticipated profits by more than the specified amount, over a three year period, then excess profits have been realized and must be refunded to policyholders unless a refund would render the insurer insolvent. *Page 15 
Heritage seeks a declaration that Beacon has violated the excess profits statute by failing to file reports containing the data identified in the statute.[15] Implicit in its claim is that Beacon has earned excess profits and, therefore, Heritage would be entitled to a refund. See § 27-9-51(g) (providing for cash refunds to policyholders, or credits on future insurance purchases, on a pro rata basis). Although not entirely clear from the record, it appears that Beacon has not filed reports which comply with the requirements of the statute. (DBR Decision 7.) However, Beacon has taken the position, and DBR agrees, that the excess profits statute does not apply to Beacon. (DBR Decision 3-13.) Since the DBR devoted most of its decision to analyzing why the statute is not applicable to Beacon, this Court will address whether its conclusion was correct in this regard.[16]
As the Court has highlighted above, the General Assembly repeatedly used the word "shall" throughout the excess profits statute, giving "insurance groups" no discretion to as to whether they must file the reports and giving the DBR little discretion[17] as to whether refunds must be ordered. Moreover, the statute clearly applies to insurers which write workers' compensation insurance. See § 27-9-3 (making chapter 9 applicable to insurers which "write any of the kinds of insurance to which this chapter *Page 16 
applies"); § 27-9-8.2 (stating that, although chapter 9 generally does not apply to workers' compensation insurance, its provisions do apply to such insurance where "expressly provided"); § 27-9-51(a) (providing expressly that insurance groups shall file certain data "for workers' compensation and employers' liability insurance"). Because Beacon is organized as a domestic mutual insurance company and writes workers' compensation insurance, it appears that the excess profits statute would apply to it. See Pub.L. 2003, ch. 410, § 3(b), 9, 10(9), 11(a).
In spite of these provisions, which have not been explicitly repealed, DBR concluded that the statute did not apply to Beacon. In reaching its conclusion, it reviewed the history of workers' compensation insurance in Rhode Island, the evolution of the various statutes regulating such insurance, and Beacon's enabling statute. See DBR Decision 8 (describing the excess profits statute as "a remnant of the statutory scheme that was applicable to workers compensation prior to the formation of Beacon). Essentially, DBR has concluded that the statute has been implicitly repealed, at least as applied to Beacon. In order to assess the merits of this conclusion, the Court will describe the development of the various applicable statutes which may affect the applicability of the excess profits statute.
 A. Legislative History of Workers' Compensation Insurance Regulation
The excess profits statute is found in Title 27, chapter 9 of the General Laws of Rhode Island 1956 entitled "Casualty Insurance Rating." It is not found in chapter 7.1 of the same title, which specifically applies to rate regulation for workers' compensation *Page 17 
insurers. This discrepancy is partially explained by the historical development of the two chapters.
Prior to 1982, chapter 9 applied to many forms of casualty insurance including workers' compensation insurance. See G.L. 1956 § 27-9-1 to27-9-50 (1968 Reenactment) (enacted by Pub.L. 1948, ch. 2089, § 1). That chapter provided for the filing of insurance rates with the regulatory authority "to the end that [such rates] shall not be excessive, inadequate, or unfairly discriminatory." Section 27-9-1 (1968 Reenactment). Insurers could meet their obligations either by filing their own rates, or by joining an advisory organization such as the National Council on Compensation Insurance (NCCI), which would file rates on their behalf. See § 27-9-8 (1968 Reenactment) (providing for filing by advisory organizations); DBR Decision 7 (identifying NCCI as the state's current advisory organization). State regulatory officials could then determine whether or not those rates were in compliance with the applicable standards.
In 1982, the legislature made two notable changes to the regulatory scheme then existing. First, the 1982 legislation enacted the excess profits statute. Pub.L. 1982, ch. 32, art. 4, § 1. DBR describes the excess profits statute as
 "one of a number of changes to the workers compensation laws enacted during the 1980s in reaction to a collapsing workers compensation market. [The excess profits statute] is a result of the mistaken assumption that conduct of insurers, rather than rising claims costs, was causing the rising premiums and collapse of the market. These "reforms" did not positively affect the market and by 1990, the workers compensation market in Rhode Island essentially collapsed." (DBR Decision 8.) *Page 18 
Second, the 1982 legislation restricted an insurer's ability to use advisory organizations to file rates. If a workers' compensation insurer wrote more than two percent of the premium volume in Rhode Island, then it was no longer permitted to use an advisory organization and instead was required to file its own rates. Pub.L. 1982, ch. 32, art. 5, § 1.
In 1985, the legislature added chapter 7.1, entitled "Workers' Compensation Insurance," to the General Laws. Pub.L. 1985, ch. 365, § 18. Chapter 7.1 is important because Beacon is currently subject to rate regulation under that chapter. This new chapter contained standards and procedures for rate filing which were specific to workers' compensation insurance; however, it did not completely supplant chapter 9, which continued to govern such insurance in certain respects.See Pub.L. 1985, ch. 365, § 18 (enacting § 27-7.1-10, which made the provisions of chapter 9 applicable to public hearings on insurance rates); id. § 19 (amending § 27-9-8 so that workers' compensation insurers which wrote more than one percent of premium volume — as opposed to the prior two percent threshold — were prohibited from using an advisory organization to file its rates).
By 1992, the workers' compensation market in Rhode Island had reached a state of crisis which necessitated "sweeping" legislative reforms. Pub.L. 1992, ch. 31, § 1 (enacting § 28-29-1.2, which states the legislative finding that a crisis existed in the workers' compensation system). Premium costs were high, which caused insurers and employers to leave the Rhode Island market. See, e.g., App. A to Beacon Mem. Opp. to Appeal (containing various news accounts describing the state of the market). Therefore, the legislature enacted the "Fresh Start" statute in order to induce other insurers to return *Page 19 
to the Rhode Island workers' compensation market.[18] The "Fresh Start" statute provided a formula for insurers to recover deficits incurred in previous years. Pub.L. 1992, ch. 31, § 25 (enacting §27-7.1-22, which has since been repealed by Pub.L. 2002, ch. 292, § 23); see DBR Decision 9 (describing the "Fresh Start" provisions).
In 1998, the General Assembly passed certain amendments to the rate filing statutes. Pub.L. 1998, ch. 148, §§ 1-6. This law enacted the present version of § 27-9-8 which eliminates the distinction between insurers with greater than or less than one percent of the market for insurance in Rhode Island. Id. § 4. Now, all insurers can satisfy their rate filing obligation by utilizing an advisory organization, regardless of its market share. Section 27-9-8(a). These advisory organizations file "prospective loss costs" with the DBR.[19] Insurers who utilize these costs then file a loss cost multiplier "which represents the additional costs which will be included in the actual rates charged to employers by that particular [insurer]." (DBR Decision 21.) That multiplier varies depending upon various attributes of the particular insurer. For example, since Beacon is a non-profit entity, its multiplier would not include a profit component. See id.
In addition, the 1998 legislation significantly curtailed the applicability of chapter 9 ("Casualty Insurance Rating") to workers' compensation insurance. See G.L. 1956 § 27-9-8.2 (2002 Reenactment) (enacted by Pub.L. 1998, ch. 148, § 5) (stating that except "as expressly provided in this chapter and chapter 7.1 of this title, the provisions of this chapter shall not apply to workers' compensation insurance").[20] *Page 20 
The 1998 legislation also provided for a transition period during which insurers were permitted to use their previously filed rates for three years — until July 7, 2001. Pub.L. 1998, ch. 148, § 3 (enacting § 27-7.1-24). Insurers who utilized an advisory organization could use the old rates "until the insurer [made] its own filing to change its rates, either by making an independent filing and adopting an advisory organization's approved prospective loss costs, or modifications thereof." Id.
In 2001, the transition period was extended to five years — until July 7, 2003. See § 27-7.1-24 (modified by Pub.L. 2001, ch. 18, § 1; Pub. .L. 2001, ch. 34, § 1). The legislature also added the following sentence to the transition provision:
 "No advisory organization shall file, and the [DBR] shall not accept a filing by an advisory organization, as to proposed changes in rates previously approved unless the filing shall include relevant data through July 7, 2003." Section 27-7.1-24 (added by Pub.L. 2001, ch. 18, § 1; Pub.L. 2001, ch. 34, § 1).
Relevant data would not be available until the middle of 2004, after which the DBR would still need to approve the advisory loss costs. (DBR Decision 10.) Therefore, after the 2001 revision, it was not possible to use rates derived from an advisory organization until January 2005.See id.
Finally, in 2002, the Fresh Start statute was repealed as part of a "Statutes and Statutory Construction" act which made technical corrections to various titles of the General Laws. See G.L. 1956 §43-4-18(a) (authorizing the reenactment of titles of the General Laws and providing that "[s]ubstantive changes contained in the reenactment of these titles shall be annually brought to the attention of the general assembly in a *Page 21 
`Statutes and Statutory Construction' bill, prepared by the law revision office, for general assembly approval or disapproval").[21] It appears that the Fresh Start statute was deleted because it had become obsolete. (DBR Decision 9 n. 5.)
 B. History of Beacon's Enabling Acts
In 1990, the legislature created the "state compensation insurance fund" which eventually became known as Beacon. Pub.L. 1990, ch. 32, art. 2, § 1 (enacting chapter 7.2 of Title 27, which created Beacon as a non-profit independent corporation organized as a domestic mutual insurance company). Its original purpose was simply to provide workers' compensation insurance to employers. See id. (enacting § 27-7.2-2). Essentially, Beacon became another option for employers seeking workers compensation insurance in Rhode Island. No express provision was made for rate regulation in the original act — presumably, as a domestic mutual insurance company, it was subject to the same regulations as any other insurer.
In 1992, in response to the crisis in the workers' compensation market, Beacon's enabling legislation was changed to designate Beacon as the insurer of last resort for the Rhode Island market. Pub.L. 1992, ch. 31, § 27. This was accomplished in the same legislative act which contained the "Fresh Start" provisions. Id. § 25. The prior practice, which utilized an assigned risk pool to service the residual market, was discontinued. See DBR Decision 8 (stating that in the 1980s "all insurers writing workers' compensation insurance in Rhode Island were required to participate in the pool in the same proportion as their participation in the voluntary market"). As a result, any employer who could not *Page 22 
obtain insurance from an insurer on a voluntary basis would be insured by Beacon, which was required to provide the insurance. See Pub.L. 1992, ch. 31, § 27 (enacting § 27-7.2-8(b)(c), which established both a voluntary risk program and a residual risk program, and required that they be maintained in separate accounts).[22] Beacon's residual risk program was not subject to rate regulation under chapter 7.1 of Title 27; however, Beacon's enabling act specifically gave the DBR certain regulatory powers over Beacon's residual market rates. Id. § 28 (amending § 27-7.2-9.1(c)).
Beacon's enabling statute was amended in 1996 to eliminate the separation of its voluntary and residual funds. See generally Pub.L. 1996, ch. 24, § 1. It also provided that the rate regulation scheme of chapter 7.1 would apply to all of Beacon's insurance except as otherwise provided in Beacon's enabling act. See id. (enacting § 27-7.2-9(c)).
Finally, in 2003, Beacon's enabling act was removed from chapter 7.2, Title 27 of the General Laws, but remained enacted as a Public Law. Pub.L. 2003, ch. 410, §§ 22-24; see G.L. 1956 § 43-2-2.1 (referring to the acts "of a general and permanent nature" as being appropriate for codification in the General Laws). Beacon continues to be operated as a domestic mutual insurance company, with all the powers necessary in order to perform the functions of such a company in the business of providing workers' compensation insurance. See Pub.L. 2003, ch. 410, §§ 3(a), 3(b), 9, 10(9), 11(a). It also remains subject to rate regulation under chapter 7.1 of Title 27. Id. § 11(c). *Page 23 
 C. Legislative Intent to Repeal the Excess Profits Statute
The Defendants have a high burden to demonstrate that the excess profits statute has been repealed by implication. Town of Johnston v.Santilli, 892 A.2d 123, 136 (R.I. 2006) (Robinson, J., dissenting) ("It is a basic principle of statutory construction that repeals by implication are disfavored.") (citing Berthiaume v. School Committeeof Woonsocket, 121 R.I. 243, 248, 397 A.2d 889, 893 (1979)). Only when the former and the latter statutes are "irreconcilable" can a court conclude that repeal has occurred. Id. at 136 n. 16. "[I]t must be shown that the later statute is so repugnant to the earlier one that the two cannot logically stand together." Id. (citations omitted). If possible, a Court must attempt to give meaning to both statutes even if they conflict somewhat. Blanchette v. Stone, 591 A.2d 785, 786 (R.I. 1991);Sutherland Statutory Construction § 23.09 at 337-38. Therefore, the Court will analyze whether any of the statutes described above are so inconsistent with the excess profits statute that they would constitute an implicit repeal.[23]
The DBR generally concludes that "appropriate rate regulation is. . . the best and only way to fulfill the intent of [the excess profits statute] today without causing the harm that the legislature clearly intended to avoid in the string of reform legislation passed in the last 15 years." (DBR Decision 12.) As an initial matter, however, the Court is not convinced that regulation through rate filing is inherently inconsistent with the excess profits statute. First, chapter 9 has subjected workers' compensation insurers to this form *Page 24 
of regulation since 1948, and the General Assembly must have been aware of this when they enacted the excess profits statute in 1982. Moreover, a determination of "excess profits" depends upon information contained in an insurer's rate filings. See § 27-9-51(b)(2) ("defining `anticipated underwriting profit' as a function of the percentage factor for profits and contingencies which is contained in rate filings). Therefore, the excess profits statute was intended to complement the rate filing scheme as an additional measure to control the cost of insurance: rate filings regulate prospectively, while the excess profits statute operates retrospectively.
DBR suggests in its decision that the 1992 "Fresh Start" provisions evince a legislative intent to repeal the excess profits statute.See DBR Decision 3 (noting that Heritage argued, "contrary to the [DBR's] interpretation, [that the excess profits statute] was not repealed by implication when the "Fresh Start" provisions were enacted"). Although DBR does not appear to rely on this argument in its decision, the Court will address it.
The "Fresh Start" provision applies only to "deficits." If there were deficits for a policy year, then an insurer was permitted to assess a "deficit surcharge" against policyholders in future years. Pub.L. 1992, ch. 31, § 25; Pub. .L. 1998, ch. 148, § 2 (enacting § 7-1.1-22(b), which defines "deficits" for a given policy year as the amount by which incurred losses and expenses for all Rhode Island risks exceeds premiums collected from such risks, and investments allocable to such risks).Compare § 27-9-51(d) (defining underwriting gain or loss for purposes of determining "excess profits" as losses and expenses subtracted from earned premiums). If the premiums collected exceed costs in a given year, then there may be excess profits. However, if costs exceed *Page 25 
premiums, then there is no chance of realizing excess profits. Therefore, the Court does not find any inconsistency in the "Fresh Start" provisions that would constitute a repeal of the excess profits statute — both may be given effect.
DBR next analyzes the transition provision enacted in 1998, and amended in 2001, and finds a legislative intent that the excess profits statute no longer be applied to Beacon. See § 27-7.1-24 (as amended) (providing that insurers and advisory organizations "are not required to immediately refile rates previously approved," and may use former rates "until the insurer makes its own filing to change its rates, either by making an independent filing and adopting an advisory organization's approved prospective loss costs, or modifications of those loss costs").[24] DBR reasoned that the legislature
 "in essence froze workers compensation rates in Rhode Island. Thus, during this seven year period [between 1998 and 2005], the legislature essentially stated that whether rates were excessive or inadequate was not the inquiry to be made. Rather, insurers were specifically directed as to what rates were to be used during the given time period by specific legislation. Since NCCI was barred from filing, and DBR from accepting a rate filing, the legislature essentially declared that insurers would rate on their filings as of 1998 without change since individual insurer [sic] did not have sufficient credible data to submit independent filings during this time period. This was so whether or not the insurer's premium was inadequate or excessive. . . ." (DBR Decision 10.) (Footnote omitted.)
DBR's conclusion, that the legislature "essentially" intended rates to remain fixed, appears to infer more from the statutory text than actually is stated.
Clearly the DBR is correct that between 2001 and 2005, the transition provision made it impossible for an insurer to revise rates by using an advisory organization's *Page 26 
services. However, Heritage points out that the statutory bar was not in effect between 1998 and 2001. Therefore, during that time period, there was no statutory impediment to an advisory organization filing, and an insurer adopting, a revised rate based upon the advisory organization's prospective loss cost estimates.
Moreover, insurers always retained the right to set their rates independently from the advisory organization. See § 27-7.1-12.1(d) ("The advisory organization and any member or subscriber of it may not interfere with the right of any insurer to make its rates independently of the advisory organization"); see also § 27-7.1-5.1(a) (stating that an insurer may file rates either by "filing its final rates or by filing a multiplier to be applied to prospective loss costs that have been filed by an advisory organization"). Therefore, even if an advisory organization's services were not available, an insurer could still revise its rates independently. The transition provision did notrequire an insurer to file revised rates between 1998 and 2003; however, it did not prohibit the filing of such rates. Therefore, if DBR is correct in its conclusion that the legislature effectively froze rates between 1998 and 2005, that conclusion does not follow solely from the statutory text, and becomes a factual inquiry. See DBR Decision 10 (stating that individual insurers lacked sufficient data to independently file its rates).
The Court need not decide whether this conclusion is supported by substantial evidence, however. Even if the legislature effectively intended that insurance rates remain fixed for policy years between 1998 and 2005, it still does not follow that the excess profits statute was repealed, because the two statutes would not be irreconcilable.See Berthiaume, 121 R.I. at 248, 397 A.2d at 893. While the rate filing process takes place prospectively, before new rates become effective, the excess profits statute operates *Page 27 
retrospectively. Compare § 27-7.1-5.1 (providing generally that rates be filed before becoming effective) with § 27-9-51(b)-(c) (calculating excess profits for the three most recent calendar years, based upon loss experience and earned premiums for the three most recent accident years). If the legislature intended not to regulate rates prior to a given policy year — perhaps because there was insufficient data on which to base a rate modification — it could still have intended for the excess profits statute to regulate the costs to policyholders at the conclusion of that year. Since the presumption against implicit repeal requires this Court to give meaning to both statutes if possible, the Court finds that DBR's analysis and conclusions with respect to the transition provision was erroneous.[25]
Finally, DBR relies on Beacon's enabling act to conclude that the excess profits statute does not apply to Beacon. See Pub.L. 2003, ch. 410, § 11(c)(1) (stating that except as provided in § 11(d), Beacon "shall be subject to rate regulation under chapter 7.1 of title 27"). It reasoned that "[b]y specifically identifying only chapter 7.1 as being applicable to Beacon, the legislature determined that Beacon was not subject" to the excess profits statute. (DBR Decision 13.)
However, it does not follow that because chapter 7.1 does apply to Beacon, that chapter 9 does not apply. As noted earlier, provisions of both chapters have been applied to workers' compensation insurers.See § 27-9-3 (making chapter 9 applicable to insurers which "write any of the kinds of insurance to which this chapter applies"); § 27-9-8.2 *Page 28 
(stating that chapter 9 applies to workers' compensation insurance where "expressly provided"); § 27-9-51(a) (applying excess profits statute specifically to workers' compensation and employers' liability insurance). The Court has not found any language which would exclude chapter 9 from applicability to Beacon. Beacon is a "domestic mutual insurance company" which writes workers' compensation insurance.See Pub.L. 2003, ch. 410, § 3(b), 9, 10(9), 11(a). Therefore, in the absence of any contrary provision in Beacon's enabling act, it is subject to the laws applicable to any other workers' compensation insurer.
DBR's Decision suggests that the excess profits statute was ill-advised, does not serve any beneficial purpose in the worker's compensation market, and indeed, may actually have caused harm to that market when it was enacted. The DBR describes the excess profits statute as
 "clearly anti-competitive and inconsistent with the aforementioned market reforms of the period. In addition, the [DBR's] consulting actuaries concluded that the required "excess profits" reports were not sufficient to derive any meaningful measure of profit. In fact, the requirements of the statute could even be detrimental to the market in that so-called "excess profits" could be indicated without any meaningful consideration of losses or even the overall financial viability of the company reporting." (DBR Decision 11.)
Even if this Court was persuaded by the DBR's position, however, neither the DBR nor this Court is charged by our Constitution with the duty of enacting statutes. See Sutherland Statutory Construction, § 23.10 at 353 (noting that the presumption against implicit repeal is "grounded in judicial respect for the ultimate authority of the legislature to make laws"). It is the General Assembly which does so, and the General Assembly has spoken by enacting the excess profits statute. If the DBR is correct that the statute *Page 29 
has become obsolete or harmful, then it should persuade the legislature to repeal that law. However, administrative agencies are not at liberty to disregard statutes which unequivocally direct them to take certain actions, even if they disagree with those actions. Therefore, until such time as the legislature explicitly repeals the excess profits statute, the DBR must enforce its terms.
 D. Further Proceedings
Because DBR found that the statute did not apply to Beacon, it did not pass on whether Beacon actually has realized excess profits which must be divested. In fact, it is not clear that Beacon has even filed the information necessary to determine whether excess profits have been realized. Therefore, the Court will remand this issue to the DBR for further proceedings consistent with the mandates of the excess profits statute.
Beacon has suggested in its brief that it is not an "insurance group" within the meaning of the excess profits statute, which does not explicitly define the term. It has also suggested that, while the excess profits statute may apply to voluntary insurers, it does not apply to the state's residual insurer.[26] The DBR did not address these issues in its decision, however. On remand, the DBR should determine whether Beacon is such an "insurance group" and whether its status as residual insurer affects any obligation to file excess profits reports. *Page 30 
 IV Conclusion
After due consideration of the arguments advanced by counsel in their memoranda, the Court will (1) affirm the DBR's decision which denied the request for a statement that the phrase "lowest possible price" allows for a private cause of action; (2) affirm DBR's decision with respect to the formation of the Castle Hill Insurance Company; and (3) remand this case for further proceedings as to whether Beacon violated G.L. 1956 § 27-9-51 relating to excess profits. Counsel for Heritage may present an order and judgment which shall be settled after due notice to counsel of record.
[1] Pub.L. 2003, ch. 410, § 3(a) (formerly codified in G.L. Title 27, Chapter 7.2).
[2] See Heritage Healthcare Servs., Inc. v. The Beacon Mut. Ins.Co., C.A. No. 02-7016, 2007 R.I. Super. LEXIS 61 (Apr. 16, 2007) (Silverstein, J.) (denying Plaintiffs' request to compel production of a draft "market conduct" report prepared by DBR due to the agency's deliberative process privilege); 2005 R.I. Super. LEXIS 140 (Aug. 29, 2005) (Silverstein, J.) (dismissing a claim based upon the "lowest possible price" language in Beacon's enabling statute, because such issues are properly within the jurisdiction of the DBR); 2004 R.I. Super. LEXIS 29 (Jan. 21, 2004) (Silverstein, J.) (dismissing claim based upon the "excess profits" statute because such claims are properly brought before the DBR in the first instance).
[3] Rulings which dispose of petitions for declaratory relief are entitled to the "same status as agency orders in contested cases" and are therefore reviewable under § 42-35-15. Section 42-35-8.
[4] The "fund" means "the state compensation insurance fund known as The Beacon Mutual Insurance Company." Pub.L. 2003, ch. 410, § 2(2).
[5] Heritage variously alleges that Beacon has either misspent its funds, or has built up an excessive surplus of the funds resulting from excessive premiums charged. See DBR Decision 19-20 and HeritageHealthcare Servs. v. Beacon Mut. Ins. Co., 2005 R.I. Super. LEXIS 140 (R.I.Super.Ct. Aug. 29, 2005).
[6] Although the rate setting procedures play a large part in the ultimate price of insurance, other factors also affect price, because rates apply generally and do not account for variations between individual policyholders. See § 27-7.1-1.1(13) (defining rate as a premium, policy, membership fee, or other charge prior to application of individual risk variations); § 27-7.1-9(c) (providing a method for computing individual premium adjustments). In addition, premiums are often paid through advance deposits before the actual amount of the premium is finally determined. Therefore, rates must take into account "dividends, savings, or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members, or subscribers." Section 27.7.1.4.1(2)(iii).
[7] Unless otherwise noted, citations to Title 27 refer to the 2002 Enactment as updated by the 2006 Pocket Supplement.
[8] The Court also noted in its decision that "it is quite clear that the legislature intended that disputes regarding the rate setting and conduct of insurance companies be resolved in an administrative forum."Heritage Healthcare Servs. v. Beacon Mut. Ins. Co., 2005 R.I. Super. LEXIS 140, *13 to *14.
[9] Beacon also has the authority to apply premium surcharges to employers based upon their risk characteristics. Pub.L. 2003, ch. 410, § 11(d)(3). Such a surcharge is also subject to appeal to the Director of the DBR. Id.
[10] Such requirements include contributing to the other state's insurers' insolvency fund, which provides protection for policyholders if their insurer becomes insolvent. Fronting also allows an out-of-state insurer to avoid participating in the other state's residual insurance market, which requires licensed insurers to share in the risks of employers for whom no insurer will voluntarily provide an insurance policy.
[11] The DBR and Beacon rely on Pub.L. 2003, ch. 410, § 6, which grants Beacon's board the power
 "to perform all acts necessary or convenient to the exercise of any power, authority, or jurisdiction over the fund, either in the administration of the fund or in connection with the insurance business to be carried on by it under the provisions of this act, as fully and completely as the governing body of all other domestic insurers to fulfill the objectives and intent of this act."
[12] DBR questioned whether even an active policyholder in October 2003 would have standing to challenge the creation of Castle Hill, because it would not have any grounds to compel Beacon to pay a dividend. (DBR Decision 16.) As Heritage was not a policyholder, however, the Court need not address this question.
[13] Accident costs for a given policy year are not finally known for some time after the conclusion of that policy year. Therefore, the excess profits statute provides for application of standard actuarial techniques to estimate the accident costs. See § 27-9-51(c) (providing that accident costs and loss adjustment expenses be "developed" to an ultimate basis); § 27-7.1-1.1(5) (defining "developed losses" as losses adjusted using standard actuarial techniques, to eliminate the effect of differences between current payment or reserve estimates and those which are anticipated to provide actual ultimate loss (including loss adjustment expense) payments").
[14] Since Beacon is a non-profit entity, the "percentage factor" for profits and contingencies is likely to be low. Therefore, it appears much easier for a non-profit entity to realize "excess profits" under the statute.
[15] Heritage had also sought to bring a direct action for damages against Beacon based on the excess profits statute. This Court found that the statute did not afford a private cause of action, however, and dismissed its claim. Heritage Healthcare Servs. Inc. v. The Beacon Mut.Ins. Co., 2004 R.I. Super. LEXIS 29, *4 to *7 (Jan. 21, 2004). "Not until all available administrative remedies have been exhausted, is the judicial forum appropriate for review of these claims" pursuant to the APA. Id.
[16] The DBR stated in its decision that
 "Beacon has filed reports and/or correspondence with the Department with regard to this statute with which [Heritage] has been provided copies. The reports filed by Beacon did not report any "excess profit" under the statute and advanced the position that since they exist as the statutory residual market and the statute applied only to voluntary writings, that it was not applicable." (Decision 7.)
See Letter of Clark to Daigneault, Feb. 17, 2005, Ex. J. to Beacon's Mem. Opp. Heritage's App., Apr. 19, 2007. Heritage's complaint before DBR suggests that Beacon has not filed the reports since 1996. Therefore, the Court will assume that no reports have been filed by Beacon.
[17] As noted above, DBR must order a refund unless it would render the insurer insolvent.
[18] As described below, this same enactment also designated Beacon as the insurer of the residual market for workers' compensation insurance in Rhode Island.
[19] Advisory loss costs are described by the DBR as "an estimate of what the losses are projected to be for each proposed classification based upon the data reported to the advisory organization by all carriers writing workers['] compensation insurance in Rhode Island." (DBR Decision 21.)
[20] As enacted by Pub.L. 1998, ch. 148, § 5, this provision read as follows: "Except as expressly provided in this act andchapter 27-7.1, the provisions of chapter 27-9 shall not apply to workers' compensation insurance." (Emphasis added.) The italicized words were changed as part of the 1998 Reenactment. See § 27-9-8.2 (1998 Reenactment, Compiler's note). The Court finds that the codified version accurately represents the legislature's intent in enacting §27-9-8.2.
[21] The excess profits statute was also amended in the same technical corrections act. Heritage has argued that the amendment evinces a legislative intent that the excess profits statute remain in force. However, the Court does not believe that such intent may be inferred from a bill whose sole purpose is to correct technical deficiencies revealed by the reenactment process.
[22] Beacon, therefore, became the sole insurer of the residual market. In exchange for its new role, however, it gained certain other advantages such as the ability to apply rate surcharges to risky employers. See, e.g., Pub.L. 1992, ch. 31, § 28 (enacting § 27-7.2-9.1(d)(iv), which provided for a surcharge of three times the otherwise applicable rate).
[23] There are certain situations where a Court properly defers to an agency's interpretation of an ambiguous statute that that agency is charged with enforcing. See, e.g., Labor Ready Northeast, Inc. v.McConaghy, 849 A.2d 340, 343 (R.I. 2004). However, this case does not involve the construction of an ambiguous term in the statute. DBR has not interpreted the meaning of the excess profits statute; rather, it has decided that it need not enforce it. Therefore, the Court finds that whether or not the excess profits statute has been implicitly repealed is purely an issue of statutory interpretation for which the agency is owed no deference. The Court will obviously consider DBR's interpretations, however, to the extent that they are persuasive.
[24] This provision was made applicable to Beacon in 1996. Pub.L. 1996, ch. 24, § 1 (enacting § 27-7.2-9(c)).
[25] The Court reaches a similar conclusion with respect to a transition provision, applicable solely to Beacon, which allowed Beacon to issue policies in the residual market after May 1992 without first filing its rates with DBR. Pub.L. 2003, ch. 410, § 11(d)(4) (originally enacted as § 27-7.2-9.1(d)(v) by Pub.L. 1992, ch. 31, § 28). DBR relies on this provision to conclude that the excess profits statute was not applicable to Beacon. However, even if Beacon's residual rates were frozen, the excess profits statute may still be given effect.
[26] Apparently, the form used by DBR for excess profits reports only seeks information relative to the voluntary market. Therefore, Beacon argues that it need not file such reports, although it has not provided any relevant statutory authority for its position. DBR acknowledged Beacon's position on this subject, but never addressed the merits of the argument. (DBR Decision 7.)